Filed 11/29/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MISSION BAY ALLIANCE et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> OFFICE OF COMMUNITY INVESTMENT AND INFRASTRUCTURE et al., <br><br> Defendants and Respondents. <br><br> GSW ARENA LLC et al., <br><br> Real Parties in Interest and Respondents. | A148865 <br><br> (City & County of San Francisco Super. Ct. Nos. CPF-16-514892, CPF-16-514811) |

Plaintiffs Mission Bay Alliance and others[1] appeal from the trial court's denial of two consolidated petitions to set aside the certification of the environmental impact report and related permits for the construction of an arena to house the Golden State Warriors basketball team, as well as other events, and the construction of adjacent facilities, in the Mission Bay South redevelopment plan area of San Francisco.[2]

The project proposed by real parties in interest GSW Arena LLC, an affiliate of Golden State Warriors LLC, and David Kelly is to construct a 488,000-square-foot

---

[1] Plaintiffs are two citizens groups, Mission Bay Alliance and SaveMuni, and an interested citizen, Jennifer Wade, who alleges that if the project is approved she will be adversely affected by impeded access to University of California at San Francisco medical facilities for her minor son with a congenital heart condition.

[2] Throughout this opinion we shall refer to the City and County of San Francisco as San Francisco or the city.

1

multipurpose event center with a capacity of up to 18,500 seats[3] and a variety of mixed-use structures, including two 11-story office and retail buildings, parking facilities, and 3.2 acres of open space. The proposed event center is designed to host the Golden State Warriors basketball team during the National Basketball Association season and to provide a venue for a variety of other uses, including concerts, family shows, other sporting events, cultural events, conferences, and conventions. The arena is projected to host over 200 events annually. The project purports to incorporate on-site and off-site improvements to accommodate traffic and to include a transportation management plan "to facilitate multimodal access at the event center during project operation."

The project is proposed to be constructed on an approximately 11-acre site (blocks 29-32) in the Mission Bay South redevelopment plan area in the southeastern part of San Francisco. Attached as appendices to this opinion are a diagram and an aerial photograph showing the location of the proposed project and the approved uses of the immediately surrounding parcels, which include the Mission Bay campus and medical center of the University of California at San Francisco (UCSF) and a mix of residential, light industrial, office and open space uses.

The relevant development history of the area begins in 1990 with the adoption by the San Francisco Board of Supervisors of the Mission Bay plan, an area plan of the San Francisco general plan.[4] A Mission Bay final environmental impact report (1990 FEIR) was certified in connection with the approval of the Mission Bay plan. That plan was never implemented but in 1997 the former San Francisco Redevelopment Agency (subsequently replaced by defendant Office of Community Investment and Infrastructure (OCII))[5] proposed a new project for the Mission Bay area, consisting of two separate development plans: Mission Bay North redevelopment plan and Mission Bay South

---

[3]    The capacity for basketball games will be 18,064 seats. The 488,000-square-footage figure includes 25,000 square feet of Golden State Warriors office space.

[4]    Prior to this time, the Mission Bay plan area was a largely underutilized industrial area with no established residential community.

[5]    Defendants are OCII, the city, and other city agencies.

redevelopment plan. Both plans were approved in late 1998 after certification of a combined Mission Bay final subsequent environmental impact report (1998 FSEIR), which incorporated information from the 1990 FEIR and applied to both the north and south redevelopment plans.[6]

In April 2015, the Governor certified the currently proposed project as an "environmental leadership development project" within the meaning of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[7] specifically section 21178 et seq., requiring expedited environmental review and litigation.[8] On June 5, 2015, OCII, as the lead agency, released a draft supplemental environmental impact report (DSEIR) for the project, tiered to the 1998 FSEIR. (§ 21094; CEQA Guidelines,

---

[6]     Separate design guidelines were adopted for each of the two areas. Between 2000 and 2013, nine addenda to the 1998 FSEIR were approved.

[7]     Unless otherwise indicated, all statutory references are to the Public Resources Code.

[8]     Pursuant to the directive in section 21185, rules of court have been adopted establishing procedures and a time line designed to resolve judicial proceedings challenging the adequacy of the environmental impact report or the issuance of permits or other government approvals for such a project within 270 days of certification of the record of the administrative proceedings. (Cal. Rules of Court, rule 8.702.) Section 21185, unlike section 21168.6.6, subdivision (d) which created the same time limit under comparable provisions applying to an arena project in Sacramento, does not state explicitly that the issues should be resolved within 270 days "to the extent feasible." However, the same qualification is implicit because the statute "does not impose any penalty for review that exceeds the 270 days." (See *Saltonstall v. City of Sacramento* (2014) 231 Cal.App.4th 837, 855-856.) Rule 8.702 expressly recognizes that the briefing and oral argument schedule may be modified by order of the reviewing court. (Cal. Rules of Court, rule 8.702(f), (g).)

Two hundred and seventy days from certification of the administrative record in this case ran on September 9, 2016, so that the 270-day target was not met. In part because more than two months were consumed by proceedings to transfer one action from Sacramento where it was filed improperly to the Superior Court in San Francisco, the plaintiffs' appellate reply brief did not become due until more than two weeks after 270 days had passed. Nonetheless, the parties and the courts have adhered to most of the applicable deadlines. The petitions have been resolved in this court considerably sooner than would have been the case had the project not been certified under section 21184 as an environmental leadership development project.

3

§ 15152.)[9] Following the receipt of public comments and responses thereto and a public hearing, on November 3, 2015, OCII certified the final supplemental environmental impact report (FSEIR) now under consideration. OCII found that the project would have certain significant and unavoidable effects on the environment and adopted a statement of overriding considerations, and authorized the executive director to implement a "mitigation monitoring and reporting program." OCII's executive director adopted secondary use findings for the proposed event center. On December 8, 2015, the board of supervisors rejected plaintiffs' appeal from the actions taken by OCII, approved certification of the FSEIR, adopted the CEQA findings, and approved the project.

Plaintiffs filed two separate actions seeking to set aside the certification of the FSEIR, approval of the secondary use findings, and several other approvals relating to the project.[10] Following transfer of one action from the Sacramento County Superior Court to the San Francisco Superior Court, the superior court heard argument on the consolidated petitions. On July 18, 2016, the court issued a 54-page order, substantially as proposed by defendants, rejecting all of plaintiffs' contentions and denying their petitions for a writ of mandate. This appeal promptly followed.

We have carefully considered each of plaintiffs' contentions raised on appeal. Although in some instances defendants' analysis of potential environmental impacts might have been expanded, as is commonly the case, in general the record reflects a

---

[9]     References to the CEQA Guidelines are to the regulations issued pursuant to the statute, California Code of Regulations, title 15, section 15000 et seq. The guidelines are given "great weight in interpreting CEQA, except where they are clearly unauthorized or erroneous." (*Center for Biological Diversity v. Dept. of Fish & Wildlife* (2015) 62 Cal.4th 204, 217, fn. 4.)

[10]     Plaintiffs filed actions to set aside the following additional approvals granted by the city: a place of entertainment permit granted by the city's entertainment commission and affirmed on appeal by the city's board of appeals; a design review/office space allocation granted by the city's planning commission and affirmed on appeal by the board of appeals; a transportation service plan approved by the city's municipal transportation agency and affirmed by the city's board of supervisors; and a subdivision map granted by the city's public works department and affirmed on appeal by the city's board of supervisors.

4

thorough and exhaustive study of all environmental impacts to be anticipated that were not considered in the 1998 FSEIR, and identification of numerous mitigation measures to lessen adverse impacts to the extent feasible. We conclude there is no merit to plaintiffs' objections to the sufficiency of the city's environmental analysis and its approval of the proposed project.

## DISCUSSION

The 1998 FSEIR provides a portrait of the Mission Bay project area as it existed at that time. The area was described as "a primarily industrial area occupied by block-long warehouses, concrete and gravel processing facilities, truck terminals, and surface parking with large tracts of undeveloped land that previously contained rail lines and a rail yard. Building heights generally range from one to two stories. The conveyor towers of two concrete and gravel processing facilities dominate the landscape at heights of about three stories. There are truck terminals and about 50 warehouses, buildings, other structures, and recreational uses including a golf driving range and in-line skating facility. Buildings range from small materials sheds to large warehouses. . . . Building uses include distribution and storage facilities for food products, clothing, rental furniture, and personal effects; light manufacturing; and some office uses. Uses of undeveloped areas include maintenance yards, parking areas for container trucks and commercial buses, and storage areas for construction materials." The baseball stadium, with over 40,000 seats, was under construction and would not open for another two years.

The 1998 FSEIR proposed a complete redevelopment of the area "intended to eliminate blight by facilitating development on primarily vacant and underutilized land" and "demolition of almost all existing buildings." The project area "would change from an underdeveloped industrial area with large swaths of vacant land, to a fully developed mixed use urban area, with 30,000 employees and about 11,000 residents" and change the landscape from "industrial areas into residential and commercial neighborhoods." In the Mission Bay South project area of 238 acres, approximately 61 acres was planned for development by UCSF with most of the remaining area—about 128 acres—planned for

5

commercial industrial development.[11] An arena is not mentioned in the 1998 FSEIR. The 1998 FSEIR states that secondary uses in the commercial industrial designated areas could include "nighttime entertainment."

The November 1998 redevelopment plan for Mission Bay South lists seven principal land uses: residential, hotel, commercial industrial, commercial industrial/retail, UCSF, public facility (such as a police station), and open space. Potential secondary use as nighttime entertainment was defined to include "dance halls, discotheques, nightclubs, private clubs, and other similar evening-oriented entertainment activities."

Much has changed in Mission Bay South since preparation of the 1998 FSEIR. As the initial study notes, "large portions of the Mission Bay plan area have been built out. The UCSF Mission Bay campus is located west, northwest, southwest, and partially south of the project site, and it currently includes a mix of parking structures, office buildings, research buildings, student housing, and hospital buildings. Other office buildings and vacant lots are located north and south of the site . . . ."

Environmental review of the proposed project was made in the context of this setting, with which all parties are in agreement. Plaintiffs contend that the environmental review was inadequate both because several issues requiring consideration were not addressed in the FSEIR and because several issues that were addressed assertedly were not analyzed correctly. We consider each of these contentions in turn.

**I. Sufficiency of the environmental review**

  **A. Issues excluded from review in the FSEIR**

1. *Land use in Mission Bay South*

  The Mission Bay FSEIR adopted in 1998 is a "program" environmental impact report (EIR). "A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related" geographically, "[a]s logical parts in the chain of contemplated actions," or in other relevant respects. (CEQA

---

[11]  The 1998 SEIR designates 2,650,000 square feet (61 acres) for the UCSF site; 4,163,000 square feet (96 acres) for commercial industrial and 1,394,000 square feet (32 acres) for commercial industrial/retail.

Guidelines, § 15168, subd. (a).) Adoption of a program EIR allows for "tiering," in which a program EIR "covers general matters and environmental effects" and is followed by "narrower or site-specific" EIRs as needed. (§ 21068.5.) "Subsequent activities in the program must be examined in the light of the program EIR to determine whether an additional environmental document must be prepared." (CEQA Guidelines, § 15168, subd. (c).)

OCII conducted an initial study to determine if the arena project "may have a significant effect on the environment." (CEQA Guidelines, § 15063, subd. (a).) The initial study concluded that some of the project's effects warranted more detailed environmental analysis, leading to the 2015 FSEIR, while other effects were insignificant or adequately examined in the 1998 FSEIR. The initial study determined that a supplemental EIR would be prepared to discuss, among other subjects, the project's potential impact on transportation and circulation, noise, air quality, greenhouse gas emissions, wind and shadow, utilities and service systems, public services and hydrology and water quality.

The initial study analyzed potential land use impacts, including whether the arena project would "physically divide an established community," "conflict with any applicable land use plans, policies or regulations," or "have a substantial impact on the existing character of the vicinity."[12] The initial study found that the proposed project would be incorporated within the established street plan and would "not include any physical barriers or obstacles to circulation that would restrict existing patterns of movement between the project site and the surrounding neighborhood. To the contrary, the project would include a number of features designed to encourage and promote public access and circulation." The initial study found no apparent conflict with regional plans

---

[12] These criteria for land use impact are based on CEQA Guidelines, Appendix G, which contains a sample environmental checklist that lead agencies may use to conduct an initial study. Impact on the existing character of the vicinity is not a criterion included in the sample checklist but lead agencies may tailor the checklist to their own needs and OCII has done so here. (CEQA Guidelines, § 15063, subd. (f).)

7

or policies, and noted that "[a]s part of the project approval process, OCII, the San Francisco Planning Commission, and other relevant regulatory agencies would determine whether the proposed project is consistent with their respective plans as applicable to the proposed project.[13]

The initial study also found that the proposed project would not have a substantial impact upon the existing character of the vicinity. It was noted that the 1998 FSEIR contemplated commercial, retail and nighttime entertainment uses. The event center's commercial and retail character was found compatible with the UCSF medical center and other existing uses in the neighborhood. The event center's entertainment use was deemed similar to the nighttime entertainment uses analyzed in the 1998 FSEIR although it was acknowledged that "the size and intensity of the event center use was not previously analyzed." The initial study concluded, nevertheless, that there was no significant adverse impact on community character. "Although the presence of [event center] attendees on streets and sidewalks in the vicinity of medical research, clinic, and office uses in the surrounding Mission Bay neighborhood would be noticeable compared to existing conditions, these additional people would not impede the operation of those existing uses such that adverse land use impacts would occur. Each use would continue to function as intended." In evaluating cumulative impact, the initial study stated that the

---

[13] In later permit proceedings in which OCII approved the project as a secondary use consistent with the Mission Bay South redevelopment plan, the OCII found the project to be consistent with existing plans and compatible with the adjacent UCSF campus and neighborhood as a whole. The director found that the event center "at the size and intensity contemplated and at the proposed location, will provide a development that is both necessary and desirable for, and compatible with, the neighborhood and the community." "The project, including its retail uses, restaurants, and open space, would contribute vitality to Mission Bay's street life and activate its pedestrian realms, which . . . would generally benefit the employees, students, and visitors that use the UCSF campus." Although recognizing "that views differ on issues of compatibility," the director found that "[u]se of the event center would not preclude operation of the adjacent uses. . . . [¶] . . . [T]he FSEIR demonstrates the UCSF Medical Center and event center can operate successfully and safely together. The FSEIR includes a number of measures to ensure compatibility with the neighborhood and community. . . ."

proposed project and further planned development would "create a wider mix of uses than currently exists in this portion of the City. Although this would represent a change in land use character, the combined effect would not be adverse. Each use would still function as intended, and many of the uses would be complementary."

On the basis of these findings, the subject of "land use" as such was not explicitly analyzed in the FSEIR. Plaintiffs dispute the statement in the initial study that the proposed arena will not impede the operation of existing uses of property in the vicinity, claiming that the project will adversely affect the operation of the hospital, biotechnology companies, and other occupants of the Mission Bay South area. They contend there is a "fair argument"[14] that the project will have an adverse impact on land use so that the issue was required to be fully analyzed in the FSEIR.

Initially, "fair argument" is not the proper standard of review. Substantial evidence is the proper standard where, as here, an agency determines that a project consistent with a prior program EIR presents no significant, unstudied adverse effect. (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1049 ["For purposes of the standard of review, the same substantial evidence standard applies to subsequent environmental review for a project reviewed in a program EIR or a project EIR."]; see also, e.g.*, Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 611 ["[T]he fair argument standard does not apply to review of an agency's determination that a project's potential environmental impacts were adequately analyzed in a prior program EIR."]; *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 702 ["When an agency has already prepared an EIR, its decision not to prepare an SEIR for a later project is reviewed under the deferential substantial

---

[14]     See *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75; *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316; *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109 ["[I]n preparing an EIR, the agency must consider and resolve every fair argument that can be made about the possible significant environmental effects of a project . . . ."]

evidence standard."] *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1135 ["[T]he 'fair argument' test has been applied *only* to the decision whether to prepare an original EIR or a negative declaration."]

There was a reasonable basis for OCII to conclude that the presence of the arena would not necessarily impede the operation of others in the area, including the UCSF hospital facilities. As the initial study observed, most basketball games and concerts drawing large crowds will generally occur during evening hours, "after commercial and medical office hours of nearby uses." Moreover, the initial study identified the particular impacts that might affect others in the area, including particularly traffic and noise, and designated those impacts for full analysis.[15] It is unclear what additional environmental impacts might have been studied under the label "land use" or "character of the neighborhood" that were not covered in the FSEIR. In response to questions by this court, plaintiffs have articulated no such subject.

The issue of compatibility of the event center with the surrounding area was addressed in the FSEIR and certainly brought to the attention of the decision makers. OCII received numerous comments during the CEQA review process concerning its land use determination. One comment asserted that the project would disrupt planned development of Mission Bay South as a "biotechnology and medical hub." A nurse expressed a concern that increased traffic from the project would impede access to the hospital. Other comments asserted the project's compatibility with the neighborhood's existing uses and the project's desirability. One area homeowner said the project's open space area and entertainment events would enliven the area for child residents and "enhance our neighborhood in a way that few alternatives really could achieve."

OCII responded at length to the public's comments. OCII noted that the Mission Bay development plan "contemplates a diverse array of uses to address blight and enhance economic development of the area" and asserted that "operation of office,

---

[15] In response to concerns expressed during the review process, the FSEIR also addressed measures taken to ensure that vibrations caused by construction of the project facilities would not adversely affect activities of nearby biotechnology companies.

entertainment and retail uses at the project site would not conflict" with the medical center and other existing uses. In addressing specific concerns about the project's potential impact on land use, OCII described project construction measures to minimize noise and vibration and thus avoid disruption of local biotechnology operations and transportation plans to assure emergency access to the hospital by ground and air.

Community concerns remained about traffic impeding access to the hospital, especially on those occasions when events are held at both the event center and AT&T Park. In response to those concerns, the city created a dedicated transportation improvement fund generated by project revenues and the project's sponsor agreed to work with UCSF and the city to manage traffic impacts and to limit overlapping events as necessary. UCSF expressed satisfaction with this resolution and agreed to support the project.

Thus, although—as the initial study recognized—an arena was not contemplated by the 1998 FSEIR and the proposed project "would alter the overall land use character of the project site from that analyzed" in the earlier program EIR, the potential effects of the project on the surrounding neighborhood was neither overlooked in the initial study nor omitted from the FSEIR. OCII concluded that this alteration would not impede the operation of existing uses and that conclusion finds support in the initial study, responses to comments and other information in the record, all of which must be considered. (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006)140 Cal.App.4th 911, 918; see CEQA Guidelines, § 15132.) Petitioner's land use argument is essentially a policy disagreement with OCII's determination that an event center will enhance the neighborhood. Under CEQA, "[a] court's task is not to weigh conflicting evidence and determine who has the better argument." (*Laurel Heights Improvement Assn. v. Regents of Univ. of California* (1988) 47 Cal.3d 376, 393.) Our limited function is "to compel government at all levels to make decisions with environmental consequences in mind." (*Ibid.*) The land use consequences were fully considered here. The fact that land use was not specified as a separate subject for further study did not preclude analysis and disclosure of all aspects of the project bearing upon the impacts to be expected from the

11

project on the character of Mission Bay South and activities of UCSF and others in the vicinity.

## 2. *Biological resources and habitat*

The initial study evaluated the project's potential impact on biological resources and found no significant environmental effects that were not previously identified and assessed in the Mission Bay 1998 FSEIR. Plaintiffs contest this conclusion. They note changes to the physical characteristics of the project site from the time of the prior EIR and claim the site now contains a wetland and other habitat features that will be adversely impacted by development of the site.

At the time of preparation of the Mission Bay FSEIR, the 11-acre project site "contained several buildings and facilities and was noted as lacking any notable vegetative habitat," with no threatened, endangered or rare plants or animals "known to occur in the upland portion of the Mission Bay plan area, including the project site." According to the initial study, "Subsequent to that time, the project site has been subject to building removal, grading, excavation, and construction of paved surface parking lots, fencing and utilities on portions of the site." Today, the project site consists of two paved parking lots and an undeveloped lot "largely covered in gravel" with "sparse" vegetation "dominated by non-native annual grasses and opportunistic weedy species." Adjacent to one of the parking lots is "a depressed area (measuring approximately 320 feet by 280 feet) created by an excavation and backfill associated with a prior environmental cleanup of that portion of the site. A surface swale extends west within this portion of the site to allow for drainage of surface water into the depression."

Plaintiffs characterize the excavation pit as a half-acre wetland and argue that draining and filling the pit will significantly impact endemic and migratory birds.[16] The

---

[16] Plaintiffs also state, with no elaboration, that the initial study failed to consider the site's potential as a wildlife nursery and bat migration area. In fact, the initial study includes a detailed assessment of wildlife nursery and migration and reasonably relies upon a biological site survey and existing mitigation measures in finding no adverse impact on bird nesting or bat migration.

12

initial study found the project would have no significant effect on biological resources even if the excavation pit were deemed a wetland because its value "is limited due to the sparse and ruderal nature of onsite vegetation, as well as the site's location in a densely urbanized environment." A biologist conducted a site survey and found no protected species or "desirable habitat that could support" them. The initial study concluded: "While several bird species were observed foraging and hunting onsite, these species are common to San Francisco and would continue to be supported by vegetation communities and water features found in the project vicinity. Because the excavation depressions on the site are small, isolated features resulting from recently completed hazardous materials remediation activities and are surrounded by paved areas and urban development, these features do not provide the important biological habitat functions and values that are typically associated with federally protected wetlands. As such, the proposed removal of these features would not constitute a significant adverse impact on wetland habitat resources."

The initial study's conclusion of no significant impacts on biological resources is well-supported by the record. OCII reasonably concluded, following a site survey, that the only impact would be loss of an excavation pit with limited biological value. In response to public comments, OCII noted that "the loss of such marginal habitat on site would not threaten" bird populations as other suitable habitat exists near the project site. Plaintiffs contend the site survey itself supports their claim of a significant impact on biological resources because the survey found the excavation pit and surrounding depressions to be "features that exhibit hydrology and vegetation characteristics of wetlands." It is true that the biologists who conducted the site survey noted wetland characteristics but they concluded that the site, even if characterized as wetland, did not provide valuable habitat. The biologists found that the "Habitat quality of the wetlands, as with the upland portions of the proposed project site . . . is of limited value to resident and migratory birds and common urban wildlife. Occasional visitation by waterfowl . . . or by passerine and raptor species stopping over seasonally . . . may occur; however, the site would not be considered essential habitat for these species or of local or regional

13

importance to wildlife due to its overall ruderal nature and surrounding built-up environment. Site conditions suggest that the most likely species to use the site would be common wildlife, described above, which readily adapt to urbanized environments." No substantial evidence suggests, nor has a fair argument been made, that the project will have a significant adverse effect on biological resources.

**3. *Hazardous materials***

The project site contains soil and groundwater contaminated by the historical operation of heavy industry. The 1998 Mission Bay FSEIR addressed the impact to construction workers, the public, and the ecological environment from exposure to potentially hazardous chemicals in soil and groundwater. Over the years there have been several remediation efforts that removed underground fuel storage tanks and over 100,000 tons of contaminated soil. Nonetheless, the soil at the project site remains contaminated with heavy metals, as revealed in an environmental site assessment completed by the project sponsor in 2015.

OCII concluded that an existing risk management plan adequately addresses human health and environmental risks associated with exposure to contaminated soil and groundwater, making further environmental study unnecessary. Plaintiffs argue that the risk management plan is inadequate because it fails to address contaminated soil imported to the project site following certification of the 1998 FSEIR and because it employs outdated toxicity screening levels.

Plaintiffs' assertion that "contaminated soils from other parts of Mission Bay were imported to the site" is not supported by their citations to the administrative record and we find no support elsewhere in the record. The assertion may refer to earlier remediation, which removed soil tainted with petroleum hydrocarbons and backfilled the excavations. OCII addressed plaintiffs' concern with "imported" soil by explaining, in its response to public comments: "in 2005, a portion of the site (located in the south-east area) was excavated as the 'Pier 64' response action in order to remove petroleum hydrocarbon free product. After the clean-up was completed, the area was backfilled with concrete rubble and overburden soil that had been excavated and stock-piled in order to

remove the hydrocarbon contamination. *This material came from the same area that was addressed as part of this cleanup.* The Regional Water Quality Control Board—the agency with regulatory authority over the cleanup—determined that this use of the rubble and overburden was appropriate." (Italics added.) In any event, any "importation" of contaminated soil following adoption of the 1998 FSEIR is accounted for by the 2015 site assessment that identified current conditions at the site.

Likewise, there is no basis for plaintiffs' claim that impacts related to hazardous materials are inadequately addressed in the initial study because the analysis relies upon a risk management plan that uses outdated methodologies for assessing human health and environmental risk. It is true, as OCII acknowledges, that toxicity screening levels have changed since preparation of the 1999 risk management plan. However, the 1999 plan requires compliance with *current* regulatory standards, not those that existed in 1999. As OCII explained in its response to public comments, the risk management plan mandates compliance with the current health code to "ensure that remediation of the soil and groundwater would meet current health risk standards, and that the public and site occupants and visitors would not be exposed to unacceptable levels of site contaminants during construction and operation of the project."

Thus, there was no CEQA violation in the exclusion of hazards and hazardous materials from the scope of the FSEIR.

**4.** *Recreational areas*

The initial study also concluded that the "proposed project would not increase the use of existing parks and recreational facilities such that substantial physical deterioration of the facilities would occur or otherwise result in physical degradation of existing recreational resources." Plaintiffs challenge this conclusion but the conclusion is well-supported by the record. Impact on existing parks will be eased by a planned six-acre Bayfront Park and three acres of open space within the 11-acre project site. Plaintiffs contend that the event center will attract more visitors to Bayfront Park than previously expected, but ample evidence supports the initial study's finding that the planned park will not be physically degraded by event center visitors, especially given the project's

15

inclusion of on-site open space. The exclusion of this issue from the scope of the FSEIR did not violate CEQA.

**B. Adequacy of analysis of issues in the FSEIR**

**1.** *Transportation impacts*

Chapter 5.2 of the FSEIR analyzes the potential project-level and cumulative impacts on transportation and circulation during construction and operation of the proposed project. "Transportation-related issues of study include transit, vehicle traffic on local and regional roadways, bicycles, pedestrians, loading, emergency vehicle access, parking, and construction-related transportation activities."

The FSEIR does not mask the significant traffic and congestion concerns presented by the proposed project. There is no doubt that traffic in the area will be heavy before and after basketball games and other events attended by more than 18,000 people, especially when overlapping with a game at AT&T Park which may draw more than 45,000 people. For this reason, the project was defined to include a transportation management plan (TMP) to address and mitigate the transportation and circulation impacts of the arena. The project also includes new or upgraded traffic signals or lane reconfigurations at 20 intersections and construction of six new street segments, as well as expansion or modification of light rail passenger platforms, construction of new sidewalks and bicycle lanes and expansion or relocation of existing sidewalks and bicycle lanes.

Following circulation of the DEIR, the city received approximately 80 comments predicting "traffic grid-lock" as a result of the project and questioning the impact of traffic congestion on access to adjacent UCSF hospitals and residences. In response, prior to adoption of the FESIR, the TMP was modified in consultation with city agencies and representatives of UCSF.

As explained in the FSEIR, "The TMP includes various management strategies designed to reduce use of single-occupant vehicles and to increase the use of rideshare, transit, bicycle, and walk modes for trips to and from the project site." The TMP includes provisions for the expansion of the existing Mission Bay Transportation Management

Association shuttle program, as well as event transportation and travel demand management strategies. Event transportation management strategies include, among many other components, designating taxi and shuttle stops, positioning parking control officers at key intersections and a parking control officer supervisor at a command center, and temporarily closing certain traffic lanes post-event. Travel demand management strategies include, among many other elements, participating in pre-tax commuter benefit programs, contributing to and promoting the Mission Bay Transportation Management Association shuttle program, and determining the feasibility of bundling the cost of a round-trip Muni fare into the cost of ticketed events.

The TMP also incorporates the San Francisco Municipal Travel Agency (SFMTA or Muni) special event transit service plan (Muni TSP), which provides for additional transit service during large evening events. The Muni TSP increases the frequency and capacity of light rail service on the T Third line, adds a Muni Metro shuttle via The Embarcadero, and adds Muni special event shuttles running (1) between the event center and the 16th Street Bay Area Rapid Transit (BART) station, (2) between the event center and Fort Mason, and (3) between the event center and the new Transbay Transit Center and the Ferry Building.

The TMP also includes a "local/hospital access plan" to facilitate emergency access and movement by residents and employees of UCSF in and out of the Mission Bay area. The plan, which is to be implemented by SFMTA before all large weekday evening events at the event center (i.e., events anticipating more than 12,500 attendees starting between 6:00 and 8:00 p.m., approximately 50 times per year), is configured to discourage event attendees who arrive by car from using portions of Fourth Street, Owens Street, UCSF campus internal roads, and local residential streets. Under the plan, special temporary and permanent signage will be positioned at appropriate locations to direct event traffic towards designated routes in order to access off-street parking facilities serving the event center and away from streets within the local/hospital access plan

17

network. In addition, parking control officers will be stationed at key intersections before an event to facilitate local driver access.[17]

Finally, the TMP includes specific performance standards and provisions for monitoring and refinement. "Monitoring methods include field monitoring of operations during the first four years and an annual surveying and reporting program thereafter. Surveys of event attendees and event center employees would be conducted annually, and visitor surveys of Mission Bay neighbors and UCSF staff and emergency providers would be conducted in the initial years of operation." Performance standards include, among others, a maximum 53 percent of event attendees arriving by car for weekday events and a maximum 59 percent of event attendees arriving by car for weekend events, specified limits on vehicle queuing on city streets, and all patrons able to board Muni light rail and special event shuttles within 45 minutes after the end of an event. The project proponents are required to meet all identified performance standards by the middle of their third season at the event center and for every Golden State Warriors season thereafter.

According to the FSEIR, "In the event that ongoing monitoring shows at any time that the performance standards outlined above are not being met, the project sponsor would explore additional travel demand strategies, operational efforts, or design refinements to meet the goals identified in the TMP. Revisions to this policy would be brought before the Mission Bay [Community Advisory Committee] or its successor body, for approval." A representative list of possible strategies includes, among other things, increasing "project sponsor contribution to the Mission Bay [Transportation Management

---

[17]    In addition to development of the local/hospital access plan, the city, project proponents and UCSF entered into a memorandum of understanding (MOU) under which UCSF agreed "to support the entitlement and construction of the project proponents proposed project" subject to specific terms and conditions limiting, if possible, the number of overlapping events at the arena and AT&T Park. The MOU also requires the project proponents to take action should overlapping events cause an unacceptable traffic condition (as defined in the MOU) and imposes additional restrictions on the number of overlapping events that can be held should unacceptable traffic conditions continue to occur.

Association] to directly fund incremental, event-only service, which may include additional shuttle bus purchases and/or expanded hours of operation," establishing "a partnership with a private shuttle provider for incremental, event-only service to and from satellite parking locations (if designated) or transit centers," offering "special event ferry service to the closest ferry station to the project site (similar to the existing service provided between AT&T Park and Alameda, Marin and Solano Counties by Golden Gate Transit, Alameda/Oakland and Vallejo ferry service)," and providing "transit fare subsidies to event ticket holders." Under the mitigation monitoring and reporting program, "If any mitigation and improvement measures are not implemented as required, OCII may, in conjunction with other entities listed above, pursue corrective actions including, but not limited to, the following: (1) a written notification and request for compliance; (2) withholding of permits; (3) administrative fines; (4) a stop-work order; (5) criminal prosecution and/or administrative fines; (6) forfeiture of security bonds or other guarantees; and (7) revocation of permits or other entitlements."

The FSEIR analyzes transportation impacts based on the type of activity at the event center (no event, a convention event with 9,000 attendees, and a basketball game with 18,000 attendees) at various times of day. The impacts of these activities are evaluated under conditions without a San Francisco Giants (SF Giants) baseball game and conditions with an overlapping SF Giants game. The large event activity is evaluated under these conditions with and without implementation of the Muni TSP.

The FSEIR identified significant vehicle traffic impacts at 11 of the 41 study intersections for the overall plan area, seven of which remain significant and unavoidable with mitigation. The FSEIR concludes further that without implementation of the Muni TSP, the proposed project would result in significant traffic impacts at several additional study intersections. With respect to transit, the FSEIR concludes that, with proposed mitigation including enhanced Muni transit service during overlapping events,[18] the

---

[18] Mitigation Measure M-TR-13, which provides for enhanced Muni transit service during overlapping events, states "As a mitigation measure to accommodate Muni transit demand to and from the project site and AT&T Park on the T Third light rail line during

proposed project's impacts on Muni would be less than significant under all conditions. Without implementation of the Muni TSP, however, "the proposed project would result in a substantial increase in transit demand that could not be accommodated by adjacent Muni transit capacity such that significant adverse impacts to Muni transit service" would occur during large arena events.

The FSEIR concludes that significant adverse impacts to regional transit services provided by Caltrain, Golden Gate Transit and the Water Emergency Transportation Authority (WETA) would occur under the basketball game scenario both with and without an overlapping SF Giants baseball game and that significant adverse impacts to BART would occur under the basketball game scenario with an overlapping SF Giants game. The FSEIR explains, "In order to accommodate the additional transit demand to the South Bay during weekday and Saturday evening conditions, one additional train car (average capacity of 130 passengers per car) on at least one inbound train per hour would be needed. For the weekday late evening period, two additional train cars (average capacity of 130 passengers per car) on at least one outbound train per hour would be needed. Alternatively, the transit demand could be accommodated within one special outbound train (total capacity up to 650 passengers) at the end of the basketball game, similar to the service currently being offered for SF Giants home games (two special outbound trains). [¶] In order to accommodate the additional transit demand to the North Bay, four additional Golden Gate Transit buses (40 passengers per bus) plus one ferry boat (250 to 320 passengers per boat) per hour, or alternatively seven additional buses per hour would need to be provided." The FSEIR continues, "During the weekday late evening following the end of a SF Giants evening game, BART occasionally provides

overlapping evening events, the project sponsor shall work with the Ballpark/Mission Bay Transportation Coordinating Committee to coordinate with the SFMTA to provide additional enhanced shuttle buses between key Market Street locations and the project. Examples of the additional enhanced service include Muni bus shuttles between Union Square and Powell Street Montgomery BART/Muni station and the project site. The need for additional enhanced Muni service shall be based on characteristics of the overlapping events (e.g., projected attendance levels, and anticipated start and end times)."

additional capacity to accommodate the SF Giants post-game demand. With overlapping events, additional capacity would be required to accommodate the combined BART East Bay transit demand." The FSEIR indicates that additional regional transit services "would reduce or minimize the severity of the capacity utilization exceedances for the regional transit service providers, and would not result in secondary transportation impacts" and adopts mitigation measures that require the project sponsor to work with the ballpark/Mission Bay transportation coordinating committee to coordinate with the regional transit providers to provide the needed additional transit service. Nonetheless, the FSEIR concludes that because "the provision of additional East Bay, South Bay, and North Bay service is uncertain and full funding for the service has not yet been identified," implementation of additional transit service as a mitigation measure are uncertain and the impacts remain "*significant and unavoidable with mitigation.*"

The city adopted a statement of overriding considerations with respect to the significant impacts on identified intersections and on regional transit. On appeal, plaintiffs contend that the city erred in adopting a statement of overriding considerations for the transit and transportation impacts without adequately considering additional, feasible mitigation measures.

Under CEQA, an agency may approve a project with significant, unavoidable environmental impacts if it adopts a statement of overriding considerations finding that "particular economic, social, or other considerations make the alternatives and mitigation measures infeasible and that particular project benefits outweigh the adverse environmental effects." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1198.) "[B]efore adopting a statement of overriding considerations, an agency must show that it has considered the mitigation measures and project alternatives identified in the EIR that would lessen the significant environmental effects." (*Id.* at p. 1201.) The agency is not required to "consider additional mitigation measures and project alternatives apart from those identified in an *adequate* EIR." (*Ibid.*, italics added.) Plaintiffs do not challenge the sufficiency of the "overriding

21

considerations" identified by the city and challenge only the adequacy of the underlying FSEIR.

(a.) The Muni TSP

Plaintiffs contend that the FSEIR improperly includes the Muni TSP as a component of the project rather than as a mitigation measure, so that the FSEIR fails to consider alternative feasible mitigation measures.[19] The CEQA Guidelines define a "project" as including "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (CEQA Guidelines, § 15378, subd. (a).) A mitigation measure, by contrast, involves "feasible changes in any or all activities involved in the project in order to substantially lessen or avoid significant effects on the environment . . . ." (CEQA Guidelines, § 15041, subd. (a).)

In *Lotus v. Department of Transportation* (2014) 223 Cal.App.4th 645, 656, footnote 8 (*Lotus*), this court observed, "The distinction between elements of a project and measures designed to mitigate impacts of the project may not always be clear." In that case, the EIR prepared for a highway construction project described " 'Avoidance Minimization and/or Mitigation Measures' " that were " 'incorporated into the project to avoid and minimize impacts as well as to mitigate expected impacts' " to the root systems of old growth redwood trees adjacent to the highway project. (*Id.* at p. 650.) We explained, "[T]he use of 'Cement Treated Permeable Base . . . to minimize the thickness of the structural section, provide greater porosity, minimize compaction of roots, and minimize thermal exposure to roots from Hot Mix Asphalt paving' might well be considered to define the project itself. It would be nonsensical to analyze the impact of using some other composition of paving and then to consider use of this particular composition as a mitigation measure. However, the same cannot be said of most of the

---

[19] Project applicants are encouraged to develop comprehensive transportation management plans. (See, e.g., *City of Hayward v. Trustees of the California State University* (2015) 242 Cal.App.4th 833, 851-852 [transportation demand management program included in proposed master plan and identified as mitigation measure in the EIR].)

'avoidance, minimization and/or mitigation measures' here, such as the restorative planting and replanting, invasive plant removal, and use of an arborist and of specialized equipment. These are plainly mitigation measures and not part of the project itself." (*Id.* at p. 657, fn. 8.)

Other cases have wrestled with this distinction as well. For example, in *Save the Plastic Bag Coalition v. City and County of San Francisco* (2013) 222 Cal.App.4th 863, 882, the court held that the imposition of a 10 cents fee as part of an ordinance restricting the use of disposable bags at retail stores was, "from the inception, 'part of the project design' which directly addressed the problem of single-use bags, a problem that preexisted the proposed project. It was not a 'mitigation measure' to try to alleviate some perceived difficulties in the original plan."

Arguably, some components of the TSP might be characterized as mitigation measures rather than as part of the project itself. Any mischaracterization is significant, however, only if it precludes or obfuscates required disclosure of the project's environmental impacts and analysis of potential mitigation measures.

For example, in *Lotus*, we concluded that the mischaracterization of mitigation measures as part of the project compounded a significant omission in the EIR: the failure to apply a standard of significance to impacts on the root systems of old growth redwood trees. (*Lotus, supra,* 223 Cal.App.4th at pp. 654-655.) We explained, "Absent a determination regarding the significance of the impacts to the root systems of the old growth redwood trees, it is impossible to determine whether mitigation measures are required or to evaluate whether other more effective measures than those proposed should be considered. Should Caltrans determine that a specific tree or group of trees will be significantly impacted by proposed roadwork, that finding would trigger the need to consider a range of specifically targeted mitigation measures, including analysis of whether the project itself could be modified to lessen the impact. [Citation.] . . . Simply stating that there will be no significant impacts because the project incorporates 'special construction techniques' is not adequate or permissible." (*Id.* at p. 656.)

Here, characterization of the Muni TSP as part of the project and not as a mitigation measure did not, as plaintiffs suggest, interfere with the identification of the transportation consequences of the project or the analysis of measures to mitigate those consequences. Unlike the situation in *Lotus,* the environmental impacts of the project on vehicle traffic and transit are fully disclosed in the FSEIR. The FSEIR includes analysis both with and without implementation of the Muni TSP and applies the same threshold standards to determine the significance of those impacts. By comparing the significance of the impact on local transit with and without the TSP, a reader learns that while implementation of the TSP will reduce impacts on Muni travel to a less than significant level, the impact without the TSP remains significant and unavoidable, even with alternative mitigation measures.

Plaintiffs suggest that by including the TSP in the project description the FSEIR conceals or fails to consider potentially significant impacts on Muni service outside the project area. In response to a comment, the FSEIR explains, "[T]he project includes the provision of additional bus and light rail service to accommodate the transit demand associated with the event center, and this transit demand would be accommodated within the existing and proposed Muni service. On days without events, the additional transit demand generated by the proposed office and retail uses would also be accommodated within the planned transit service." Substantial evidence supports this conclusion. In addition to the transit information discussed above, the FSEIR also analyzes the project's impacts on ten additional Muni lines throughout the city under the no event and convention event scenarios and determines that the impacts will be less than significant. The data shows that under the convention event scenario, the project is expected to generate a total of 572 trips on the 10 additional Muni lines analyzed. With the additional rides, those lines would operate overall at 70 percent of capacity and no individual line would exceed 84 percent capacity. Under the basketball game scenario, there should be lesser impacts because the Muni TSP shuttle service provides "additional options to accommodate attendees traveling to and from the event center." The Muni TSP was

24

specifically "intended to avoid the possibility that special events would overwhelm the existing transit system."

Despite the above, plaintiffs argue that the FSEIR is inadequate because it fails to consider whether the diversion of two streetcars from other lines, as provided for in the Muni TSP (in addition to the purchase of four new Muni streetcars), would cause significant impacts on the Muni lines from which those cars are diverted. Plaintiffs argue the FSEIR should have considered, as alternative mitigation, whether two additional Muni cars should be purchased rather than two cars diverted. Nothing in the record, however, suggests that diversion of two train cars from another line will cause significant impacts to that line. The FSEIR is not rendered inadequate by the failure to consider this entirely speculative environmental impact. (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 26 ["CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive."].)

Plaintiffs also argue that the FSEIR should have considered "alternate mitigation requiring the Warriors to pay for implementation of the TSP." However, " ' "CEQA does not require analysis of every *imaginable* alternative or mitigation measure; its concern is with *feasible* means of reducing environmental effects." ' " (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 841; *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1187 [Mitigation measures "may be deemed sufficient if those measures are based on a reasonable plan of actual mitigation that the relevant agency commits itself to implementing."].) The FSEIR determines that the Muni TSP will reduce impacts on local transit to a less than significant level. The FSEIR explains, "San Francisco fully anticipates implementation of [the Muni TSP] and has identified sufficient funding to implement this plan." The city has approved a Mission Bay transportation improvement fund in which project revenue will be earmarked to cover, among other things, implementation of the Muni TSP. Economic analyses contained in the record support the

city's determination that the project will generate $14.1 million in revenue for the city and exceed estimated city expenses by approximately $1.5 million.

Plaintiffs' suggestion that the Muni TSP relies on "an admittedly uncertain [funding] scheme" relies on a single statement in the record, taken out of context. The city did not admit that funding for the Muni TSP is uncertain. Rather, the SFMTA stated, in a letter to the OCII, that "The SFMTA cannot unequivocally guarantee future funding for the TSP at the levels analyzed in the project description in perpetuity; nevertheless, I am confident the SFMTA will be able to deliver the proposed service for the following reasons: [¶] 1. In September 2015, an independent fiscal feasibility analysis of the project conducted by economic & planning systems and peer reviewed by Keyser Marston Associates, Inc., shows annual anticipated project-generated city revenues of more than $14 million. This projection is anticipated to more than cover the event center related operating costs as outlined in the attached updated pro forma. [¶] 2. The FY 19 operating costs, the first full year of the event center operations, are estimated at $8.2 million. Of this amount, the SFMTA estimates that $2 million from transit fares and parking revenues will be available to cover these costs. In addition, $3.4 million is projected to be available from incremental general fund baseline and parking tax mandated by the charter associated with the event center. The remaining $2.8 million is projected to be available through the Mission Bay transportation improvement fund (Fund), a reserve fund set aside by the board of supervisors from incremental general fund revenues associated with the event center. [¶] 3. In addition to the operating needs, the project requires capital investments totaling nearly $61.9 million of which $27.4 million is expected to be available from an in lieu transit impact development fee (TIDF) payment and general fund sources associated with the event center. The remaining $34.5 million will require financing that will be paid back from the Fund. Therefore, it is expected that the city and SFMTA will apply project-generated one-time and annual revenues to address these capital needs for the project without impacting SFMTA operations or other capital projects underway or planned by the city and SFMTA." Nothing in this letter from SFMTA, or elsewhere in the record, suggests that the city will be unable to fund the Muni

26

TSP as planned. Accordingly, the FSEIR is not inadequate because it fails to consider alternative funding for the Muni TSP.

Moreover, should a problem with funding the Muni TSP arise at some future date, the performance standards and alternative mitigation strategies identified in the TMP will require the project operators to mitigate impacts on local transit. For example, if the 45-minute Muni boarding standard is not met, the Warriors must employ additional strategies to mitigate the delay. These additional measures may include the Warrior's funding the purchase of additional shuttle buses or contracting with private shuttle services to transport passengers.

(b.) Regional Transit Services (BART, Caltrain, Golden Gate Transit, WETA)

As set forth more fully above, the FSEIR determines that the project will have significant impacts on regional transit and identifies the additional regional transit service necessary to mitigate these impacts. The mitigation measures adopted in the FSEIR require the Warriors to "work with" the regional transit agencies "to provide" the necessary additional service.[20]

Initially, we reject plaintiffs' argument that the proposed mitigation measures are unenforceable and improperly defer mitigation. Although the mitigation measures call for cooperation in the provision of additional transit services, contrary to plaintiffs' argument these mitigation measures do not "allow the Warriors' owners to determine how much additional transit service is needed at a later date . . . without a performance standard in place." The mitigation measures require the Warriors to gather data on transit use and to coordinate the provision of regional transit based on the information gathered. And, as

---

[20] Mitigation Measure M-TR-5a provides, "As a mitigation measure to accommodate transit demand to and from the South Bay for weekday and weekend evening events, the project sponsor shall work with the Ballpark/Mission Bay Transportation Coordinating Committee to coordinate with Caltrain to provide additional Caltrain service to and from San Francisco on weekdays and weekends. The need for additional service shall be based on surveys of event center attendees conducted as part of the TMP." Mitigation Measures M-TR-5b and M-TR-14 impose identical requirements regarding Golden Gate Transit and WETA and BART respectively.

noted above, the TMP imposes specific performance standards, including target auto usage and Muni boarding times. The mitigation monitoring and reporting program requires ongoing monitoring and reporting to the OCII and authorizes the OCII to take corrective action against the Warriors if mitigation measures are not implemented as required. Although there are no specific standards with respect to the capacity of regional transit carriers, if regional carriers should fail to provide additional capacity following arena events, automobile usage may be expected to exceed targeted limits, triggering the necessity of corrective action by the Warriors. The FSEIR observes that "[d]espite the lack of any guaranteed outcome," the cooperative efforts of the agencies and the Warriors are expected to be successful "based on past experience." The FSEIR adds that "[t]the provision of additional regional transit service during special events is common in San Francisco." Substantial evidence supports the city's confidence that these mitigation measures will reduce the impacts on regional transit to a less than significant level.

Each of the impacted agencies has indicated a willingness to work with the coordinating committee to meet the transit demands and the record demonstrates a successful history of cooperation between the regional transit agencies. Caltrain and BART regularly provide additional transit service before and after SF Giants baseball games and special event ferries are provided between the ballpark and Alameda, Marin, and Solano Counties following games. In response to public comment, the FSEIR offers another example of how agencies are cooperating to reduce regional transit impacts: "[T]he city is working with BART on the Embarcadero-Montgomery capacity implementation plan study in a regionally coordinated approach to develop improvements to accommodate the current and increased ridership at the Montgomery Street and Embarcadero Muni/BART stations. The SFMTA and [San Francisco County Transportation Agency] are working with BART to develop concepts to increase platform capacity at these two stations, including a potential project to build new side platforms on the opposite side of the existing tracks. Matching funds for this study were provided by the SFMTA (Proposition K), the Golden State Warriors, and the San Francisco Giants." (See *Neighbors for Smart Rail v. Exposition Metro Line Construction*

*Authority* (2013) 57 Cal.4th 439, 465, citing (§ 21081, subd. (a) and CEQA Guidelines § 15091, subd. (b) (now subd. (a)(2)) ["CEQA . . . allows an agency to approve or carry out a project with potential adverse impacts if binding mitigation measures have been 'required in, or incorporated into' the project *or* if '[t]hose changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency.' "].)

Although a specific funding source has not been secured, there is substantial evidence that funding will be available to provide any additional transit service that may be required. As the chief planning and development officer at BART noted, a portion of the additional costs would be offset through farebox recovery. The FSEIR explains further that San Francisco funds "a large number of transportation improvements to local and regional transportation facilities. Funding for these improvements comes from a variety of sources including state and federal grants, tolls collected from Bay Area bridges, and a countywide ½-cent sales tax dedicated toward funding transportation improvements authorized under San Francisco's Proposition K. The [Metropolitan Transportation Commission (MTC)], as the transportation planning, coordinating and financing agency for the nine-county San Francisco Bay Area, administers and distributes federal, state and regional moneys among the various regional transit operators. For example, MTC's Core Capacity Challenge Grant Program commits $7.5 billion (including federal, state and regional funds) over 15 years to fund high-priority transit capital improvements to the region's largest transit systems, including BART. The grant program will fund transit vehicle replacement fleet expansion, and key facility upgrades noted in the comments." The record also includes a letter from the planning director of the MTC indicating that because the arena is located in a "priority development area" it would qualify for consideration under the One Bay Area Grant program to which the MTC has "committed $320 million through 2017 (and $14.6 billion through 2040—the life of the plan), from federal surface transportation legislation."

Finally, as noted above, the FSEIR requires that additional actions be taken to reduce impacts should the performance standards not be met. The identified options

29

include, in addition to the provision of additional shuttle busses, providing special event ferry service to the closest ferry station to the project site (similar to the existing service provided by the SF Giants after baseball games). These strategies can be employed to mitigate impacts on regional transit in the unlikely event that some or all of the additional regional transit services identified cannot be provided.

Despite the reasonable certainty that these regional transit impacts will be mitigated, the FSEIR deems the impacts to regional transit remain significant and unavoidable because "full funding for the service has not yet been identified." On appeal, plaintiffs fault the FSEIR for not considering alternative mitigation requiring the Warriors to guarantee funding for the regional transit service.

CEQA, however, does not require identification of a guaranteed funding source for mitigation measures specified in the EIR. (*Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2007) 157 Cal.App.4th 149, 163 [CEQA does not require "the EIR to discuss funding for mitigation measures."].) Rather, CEQA requires substantial evidence to conclude that "feasible mitigation measures will actually be implemented." (*Ibid.*; see also *Anderson First Coalition v. City of Anderson*, *supra*, 130 Cal.App.4th at p. 1187 [Mitigation measures "may be deemed sufficient if those measures are based on a reasonable plan of actual mitigation that the relevant agency commits itself to implementing."]; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 141 [CEQA requires "a reasonable plan for mitigation."].)

*Santa Clarita Organization for Planning the Environment v. County of Los Angeles, supra,* 157 Cal.App.4th 149, is instructive. In that case, the EIR for a residential subdivision proposed remediation of water wells as a mitigation measure to reduce the project's significant impacts on water services. (*Id.* at pp. 152, 156.) Project opponents pointed to evidence that the estimated cost of remediation was $500,000 per well and argued the EIR was deficient because no source of funding for the remediation was identified in the EIR. (*Id.* at p. 163.) The court rejected this argument, citing a statement in the EIR evidencing a reasonable basis on which to conclude that the mitigation

30

measures would be implemented: " 'Due to the high value of this local water resource, the purveyors have placed a high priority on replacing the impacted groundwater capacity by installing wellhead treatment and the construction of new wells.' " (*Ibid.*; compare with *Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1260-1261 [No reasonable basis to conclude mitigation measures would "*actually be implemented as a condition of development*" where the city acknowledged that there was "great uncertainty" as to whether the mitigation measures would ever be funded.].)

As set forth above, substantial evidence supports the conclusion that the Warriors can be expected to work with the transits agencies "to provide additional . . . service" sufficient to mitigate the project's impacts on regional transit. The FSEIR is not inadequate because it fails to identify a specific funding source for increased regional transit service. Given the adequacy of the FSEIR, the city was not required to consider alternative funding sources before adopting a statement of overriding considerations. That the city, in an apparent overabundance of caution, did adopt a statement of overriding considerations should the specification of a funding source be deemed essential, does not negate the sufficiency of the FSEIR. The FSEIR fully informs the public and decision-makers of the impact the project will have on traffic congestion in the Mission Bay area and articulates meaningful methods to minimize those impacts.

**2.** *Noise*

Chapter 5.3 of the FSEIR assesses anticipated construction and operational noise impacts of the arena project on sensitive noise receptors such as the UCSF hospitals and nearby residences.[21] The FSEIR concludes that noise impacts from construction of the proposed project will be less than significant with mitigation. The FSEIR also concludes that, with mitigation, impacts from stationary operational noise, such as "back-up diesel generators for maintenance purposes and mechanical equipment as well as the operation of public address systems and amplification equipment not only interior to the event

---

[21] This chapter also assesses potential vibration impacts that are not at issue on appeal.

31

center but also for occasional outdoor performances and events at the proposed Third Street plaza" will be less than significant. The FSEIR concludes, however, that mobile operational noise sources, such as vehicular traffic and crowd noise, will result in significant and unavoidable "permanent, long-term increases in ambient noise levels." The FSEIR explains: "Noise levels generated by crowds prior to, during, and after events is expected to result in a substantial increase in noise levels at the receptor adjacent to the northbound Muni T-Line transit platform, particularly during nighttime egress hours of 9 p.m. to 11 p.m., and this impact would be *significant and unavoidable*. [¶] Operation of the proposed project would introduce new mobile noise sources that would contribute to ambient noise levels in the project vicinity. Increases in roadway traffic noise would be *significant and unavoidable* during events either with or without implementation of the Muni [TSP], even with implementation of [specified mitigation measures]"

Plaintiffs contend the threshold used in the FSEIR to analyze the significance of the noise impacts is inadequate. "A threshold of significance is an identifiable, quantitative, qualitative, or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (CEQA Guidelines, § 15064.7 subd. (a).) The lead agency has substantial discretion in determining the appropriate threshold of significance to evaluate the severity of a particular impact. (See CEQA Guidelines, § 15064, subd. (b); *Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059, 1068; *Lotus, supra,* 223 Cal.App.4th at p. 655, fn. 7 ["The standard of significance applicable in any instance is a matter of discretion exercised by the public agency ' "depending on the nature of the area affected." ' "].)

Under the FSEIR, a noise impact is considered significant if it were to, among other things: "Result in exposure of persons to or generation of noise levels in excess of standards established in the local general plan or noise ordinance, or applicable standards of other agencies; [¶] . . . [¶] Result in a substantial permanent increase in ambient noise levels in the project vicinity above levels existing without the project; [¶] Result in a

32

substantial temporary or periodic increase in ambient noise levels in the project vicinity above levels existing without the project." The FSEIR adopts various thresholds of significance designed to identify perceptible increases in ambient noise levels. "Traffic noise level significance is determined by comparing the increase in noise levels (traffic contribution only) to increments recognized by Caltrans as representing a perceptible increase in noise levels. . . . [F]or noise environments where the ambient noise level is 65 dBA DNL[22] or less, the significance threshold applied is an increase of 5 dBA or more, which Caltrans recognizes as a readily perceptible increase. In noise environments where the ambient noise level exceeds 65 dBA DNL, the significance threshold applied is an increase of 3 dBA or more, which Caltrans recognizes as a barely perceptible increase. [¶] Operational noise from non-transportation sources such as egress of patrons from events or sound amplification equipment in common areas are assessed based on noise increases of 8 dBA (for noise generated by commercial uses) over existing ambient $(L_{90})$[23] levels and any applicable restrictions of the city's noise ordinance and Police Code." "[P]ersistent construction equipment noise related to an increase of 10 dBA over the existing noise levels" is also considered significant.

Plaintiffs contend the "ambient plus increment" methodology "ignores the severity of existing noise levels" and "fails to assess the significant impacts of noise on human health." Plaintiffs argue that "Using 'ambient plus increment' thresholds where existing noise levels are already high 'disregards the fact the project will make severe conditions worse' and 'results in an unsustainable gradual increase in ambient noise.' "

The CEQA Guidelines support the use of an increment-based approach. As the FSEIR explained in response to public comments: "[E]xisting-plus-project increment thresholds are appropriate to assess operational noise under CEQA in the Mission Bay

---

[22]    "dB" refers to decibels. The "dBA," or A-weighted decibel, refers to a scale of noise measurement that approximates the range of sensitivity of the human ear to sounds of different frequencies. "DNL" refers to the day-night noise level, a 24-hour noise descriptor in which a 10 dBA penalty is added during the evening hours of 10:00 p.m. to 7:00 a.m.

[23]    "$L_{90}$" is a noise metric used to describe existing ambient noise levels.

33

Plan area for two reasons. The first reason is that CEQA Guidelines Appendix G identifies a noise impact criterion to address whether the proposed project would result in 'exposure of persons to or generation of noise levels in excess of standards established in the local general plan or noise ordinance, or applicable standards of other agencies standard.' As stated on page 5.3-13 of the FSEIR, the applicable noise ordinance limits for commercial and industrial properties ([S.F. Police Code] Section 2909(b))[24] provide that 'no person shall produce or allow to be produced, a noise level more than 8 dBA above the local ambient level at the property plane.' Consequently, the FSEIR must consider operational noise impacts of commercial properties in terms of increased noise levels over existing ambient noise levels. [¶] The second reason existing-plus-project increment thresholds are appropriate to assess operational noise under CEQA is because Appendix G of the CEQA Guidelines inquires whether the proposed project would result in a 'substantial permanent increase in ambient noise levels in the project vicinity above levels existing without the project.' Here CEQA suggests that an appropriate threshold to apply is an increase over existing ambient noise levels without the project but leaves the determination of the quantitative threshold to be applied at the discretion of the lead agency." This explanation is entirely reasonable and amply supports the city's selection of the incremental standard of significance.

The incremental standard applied in the FSEIR does not ignore the severity of existing noise levels. To the contrary, the FSEIR expressly incorporates a smaller incremental threshold at intersections with ambient traffic noise in excess of 65 dBA in recognition of the "widely accepted methodology by both [Federal Transit Administration] and the Federal Interagency Committee on Noise . . . that thresholds should be more stringent for environments that are already noise impacted."

The FSEIR also adequately analyzes the cumulative noise impacts. Petitioner's argue, "Using 'ambient plus increment' thresholds where existing noise levels are already high 'disregards the fact the project will make severe conditions worse' and results in an

---

[24] See part III, pp. 53-57, *post.*

unsustainable gradual increase in ambient noise. It is a formula for ever-increasing noise levels because each new project establishes a new, higher, baseline; then when the next project is approved, the incremental change will be added to the new baseline." However, the FSEIR explicitly addresses cumulative impacts and concludes—as plaintiffs argue— that "[o]peration of the proposed project when considered with other cumulative development would cause a substantial permanent increase in ambient noise levels in the project vicinity." The FSEIR explains that the operational noise impacts "would primarily result from increased traffic on the local roadway network." A corresponding table (Table 5.3-11) includes modeled noise information for the existing, cumulative and cumulative plus project categories at several testing locations.[25] Thus, despite petitioner's quarrel with the standard of significance, they do not dispute the accuracy of the data presented in the FSEIR or its conclusion that noise impacts of the project will be significant and unavoidable.

Finally, contrary to plaintiffs' argument, the FSEIR adequately discloses the significance of the noise impacts on human health. The FSEIR provides considerable background information and "general guidelines" for noise sensitivity. According to the FSEIR, "sleep disturbance can occur at levels above 35 dBA; interference with human speech begins at about 60 dBA; and hearing damage can result from prolonged exposure to noise levels in excess of 85 to 90 dBA." Table 5-3.1 sets forth typical sound levels measured in the environment. For example, an accelerating motorcycle at a few feet away is deafening at 110 dBA, a noisy urban street is very loud at 90 dBA, near freeway traffic is loud at 60 dBA, and an average whisper is very faint at 20 dBA. The FSEIR includes a comprehensive section on the health effects of environmental noise which explains, "The World Health Organization (WHO) is perhaps the best source of current knowledge regarding the health effects of noise impacts because European nations have continued to study noise and its health effects, while the United States Environmental Protection

---

[25] The cumulative analysis assumes future development under the UCSF, 2014 long range development plan, Mission Bay campus, the eastern neighborhoods area plans, Seawall Lot 337 and Pier 48 mixed-use project and Pier 70 mixed-use development.

Agency all but eliminated its noise investigation and control program in the 1970s. According to WHO, sleep disturbance can occur when continuous indoor noise levels exceed 30 dBA or when intermittent interior noise levels reach 45 dBA, particularly if background noise is low. With a bedroom window slightly open (a reduction from outside to inside of 15 dB), the WHO criteria suggest that exterior continuous (ambient) nighttime noise levels should be 45 dBA or below, and short-term events should not generate noise in excess of 60 dBA. WHO also notes that maintaining noise levels within the recommended levels during the first part of the night is believed to be effective for the ability of people to initially fall asleep. [¶] Other potential health effects of noise identified by WHO include decreased performance for complex cognitive tasks, such as reading, attention span, problem solving, and memorization; physiological effects such as hypertension and heart disease (after many years of constant exposure, often by workers, to high noise levels); and hearing impairment (again, generally after long-term occupational exposure, although shorter-term exposure to very high noise levels, for example, exposure several times a year to concert noise at 100 dBA, can also damage hearing). Finally, noise can cause annoyance and can trigger emotional reactions like anger, depression, and anxiety. WHO reports that, during daytime hours, few people are seriously annoyed by activities with noise levels below 55 dBA or moderately annoyed with noise levels below 50 dBA. [¶] Vehicle traffic and continuous sources of machinery and mechanical noise contribute to ambient noise levels. Short-term noise sources, such as truck backup beepers, the crashing of material being loaded or unloaded, car doors slamming, and engines revving outside a nightclub, contribute very little to 24-hour noise levels but are capable of causing sleep disturbance and severe annoyance. The importance of noise to receptors depends on both time and context. For example, long-term high noise levels from large traffic volumes can make conversation at a normal voice level difficult or impossible, while short-term peak noise levels, if they occur at night, can disturb sleep." (Fns. omitted.)

Applying this information to the traffic noise level tables in the FSEIR, a reader can evaluate the severity of the existing ambient noise levels at a particular location and

36

understand how those noise levels might affect the health of nearby residents. The reader will also be able to determine whether the increase in ambient noise levels as a result of the project will be perceptible (based on the threshold of significance) and how severe the resulting change will be. The potential impact of project noise on health is thus clearly disclosed. The FSEIR need not, as plaintiffs' suggest, apply a separate health-based threshold in determining the significance of noise impacts. (See *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1356 ["[T]he determination of EIR adequacy is essentially pragmatic. Whether an EIR will be found in compliance with CEQA involves an evaluation of whether the discussion of environmental impacts reasonably sets forth sufficient information to foster informed public participation and to enable the decision makers to consider the environmental factors necessary to make a reasoned decision."].)

In sum, we find no deficiency in the FSEIR's analysis of noise impacts.

### 3. Wind impacts

Chapter 5.6 of the FSEIR addresses the wind and shadow impacts of the project. Plaintiffs dispute the sufficiency of the analysis only with respect to wind impacts. Under the threshold of significance applied in the FSEIR, the proposed project "would have a significant impact related to wind if it were to . . . alter wind in a manner that substantially affects public areas." Wind will be considered to substantially affect public areas when wind speed exceeds the wind hazard criterion of 36 miles per hour. The FSEIR studied existing wind impacts at 46 off-site locations and relates that wind speeds exceeded the wind hazard criterion at seven locations. According to the FSEIR, "Under existing-plus-project conditions, the total net number of off-site study test points at which wind speed would exceed the wind hazard criterion would be reduced from 7 to 6. However, there would also be a net increase in the total duration of wind hazards on the off-site public walkways in the project vicinity, increasing from 106 hours per year under existing conditions to 139 hours per year under existing-plus-project conditions (an increase of 33 hours)." Because the project will result in a net increase in the total duration of the wind hazard exceedance at off-site public walkways in the project

vicinity, the FSEIR considers the impact significant. Based on mitigation measures modified following public comments, including incorporation of design features demonstrated to be effective at reducing wind hazards, the FSEIR concludes that the impact will be reduced to a less than significant level.

Plaintiffs contend that the FSEIR is insufficient because it addresses only wind impacts to "off-site public areas" and fails to address significant impacts at the publicly accessible areas on the project site. Defendants argue correctly that CEQA does not require analysis of the wind impacts on the project.

"[T]he purpose of an FSEIR is to identify the significant effects of a project on the environment, not the significant effects of the environment on the project." (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 473 [FSEIR was not required to discuss the impact of sea level rise on the project.]; see also *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 905 [FSEIR was not required to discuss the impacts on staff and student health of locating proposed school near freeways.]; *Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464, 1468 [Whether preexisting physical conditions will have an adverse effect on the proposed project's residents is beyond the scope of CEQA.].) As explained in *Ballona, supra,* 201 Cal.App.4th at page 474, "identifying the effects on the project and its users of locating the project in a particular environmental setting is neither consistent with CEQA's legislative purpose nor required by the CEQA statutes." Accordingly, the city was not required to consider in the FSEIR the extent to which patrons of the project may be subject to windy conditions.

Nonetheless, because "project wind effects at on-site publically accessible areas that would be subject to substantial pedestrian use may be of interest to members of the public and to decision-makers," the FSEIR includes such an analysis for informational purposes. The DSEIR reported: "Under existing-plus-project conditions, three on-site study test points at the proposed event center on the north side pedestrian path would exceed the wind hazard criterion, for a total of 31 hours per year. No exceedances of the wind hazard criterion would occur at any of the other areas of substantial pedestrian use

at the project site." In response to public comments, the FSEIR points out that the "the project sponsor shall develop and implement a range of feasible design refinements to effectively reduce on-site wind effects, including but not limited to, the proposed addition of landscaping within the plazas; and the potential installation of vertical porous screens, overhead protection such as tilted foils and archways, and/or other screening features on the event center perimeter walkway and other publicly accessible areas. . . . [¶] It should also be acknowledged that the event center and office and retail building operators would have control of all on-site areas so as to be able to manage or preclude pedestrian access in the event of hazardous windy conditions (e.g., during a storm), which are actions typical of other private developments in the City that have on-site publically accessible open space. This would include the building podium roofs, food hall roof, event center bayfront terrace, as well as plaza areas and on-site pedestrian walkways. This can be effectively achieved through use of on-site security personnel, temporary signage and/or barriers to limit public access where needed and direct pedestrians to alternate access points and pathways." Although unnecessary, the additional information and discussion negates plaintiffs' contention that the environmental report fails to evaluate the wind impacts of the project, and to identify measures to mitigate those impacts.

**4.** *Greenhouse gas emissions*

The FSEIR found the project's greenhouse gas emissions would have no significant adverse effect on the environment because the project's construction and operation meet San Francisco's energy efficiency and conservation standards designed to reduce greenhouse gas emissions. Plaintiffs contend that compliance with these qualitative performance standards does not disclose the magnitude of the greenhouse gas emissions that will result from the project and that the FSEIR must quantify the project's greenhouse gas emissions and calculate the effect of proposed mitigation measures.

The FSEIR acknowledges, "Individual projects contribute to the cumulative effects of climate change by directly or indirectly emitting greenhouse gas during construction and operational phases" and that "the proposed project would contribute to annual long-term increases in greenhouse gas as a result of increased vehicle trips

39

(mobile sources) as well as event-related, commercial, and office operations that would result in an increase in energy use, water use, wastewater treatment, and solid waste disposal. Construction activities would also result in temporary increases in greenhouse gas emissions." The FSEIR concludes, however, that the project will not generate greenhouse gas having a significant effect on the environment because the project will comply with San Francisco's greenhouse gas reduction strategy. The FSEIR does not include "an individual project-specific impact assessment" because "the proposed project's impact on climate change focuses on the project's contribution to cumulatively significant [greenhouse gas] emissions."[26]

Plaintiffs contend that exclusive reliance on performance based standards—the project's consistency with San Francisco's greenhouse gas strategy—is inadequate and that CEQA requires the FSEIR to quantify the project's expected greenhouse gas emissions and the amount those emissions will be reduced by implementation of the greenhouse gas strategy or specified mitigation measures. Plaintiffs are mistaken.

"Determining whether a project may have a significant effect plays a critical role in the CEQA process." (CEQA Guidelines, § 15064, subd. (a).) A public agency may not approve a project that has a significant effect on the environment unless those effects are mitigated or unavoidable but acceptable due to overriding considerations. (CEQA Guidelines, § 15092, subd. (b)(2).) As our Supreme Court has observed, however, there are inherent difficulties in determining whether a project's greenhouse gas emissions will have a significant adverse effect on the environment. (*Center for Biological Diversity v.*

---

[26] The FSEIR also states that the Governor's certification of the project for expedited judicial review found that the project would not result in any net additional greenhouse gas emissions after purchase of carbon credits and cites this finding as further support for the conclusion that the project's emissions will be less than significant. (Pub. Resources Code, § 21184.) As the parties agree, the Governor's certification serves a distinct purpose and is not a substitute for a CEQA determination on the significance of greenhouse gas emissions. For purposes of appeal, we consider whether consistency with San Francisco's greenhouse gas strategy alone is sufficient to support the FSEIR's finding that the project's greenhouse gas emissions will have no significant effect on the environment.

*Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 219 (*Center for Biological Diversity*).) "First, because of the global scale of climate change, any one project's contribution is unlikely to be significant in itself. The challenge for CEQA purposes is to determine whether the impact of the project's emissions of greenhouse gases is *cumulatively* considerable, in the sense that 'the incremental effects of [the] individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects.' " (*Ibid.*, quoting § 21083, subd. (b)(2).) "Second, the global scope of climate change and the fact that carbon dioxide and other greenhouse gases, once released into the atmosphere, are not contained in the local area of their emission means that the impacts to be evaluated are global rather than local." (*Id.* at pp. 219-220.)

In recognition of the difficulty, and importance, of evaluating global climate change impacts, the Legislature directed the California Natural Resources Agency to adopt CEQA Guidelines for the mitigation of greenhouse gas emissions. (§ 21083.05.) Those guidelines grant agencies "discretion to determine, in the context of a particular project, whether to: [¶] (1) Use a model or methodology to quantify greenhouse gas emissions resulting from a project, and which model to use . . . and/or [¶] (2) Rely on a qualitative analysis or performance based standards." (CEQA Guidelines, § 15064.4, subd. (a).) Utilizing the second method, an agency may adopt an area wide plan to reduce greenhouse gas emissions and determine that a project's incremental contribution to climate change is not significant if the project complies with the requirements of the previously adopted plan. (CEQA Guidelines, § 15183.5, subd. (b).)

The Bay Area Air Quality Management District (Air District) encourages local agencies to adopt greenhouse gas reduction plans and to use those plans in making CEQA determinations.[27] In its May 2010 CEQA Guidelines update, the Air District stated: "If a

---

[27] The Air District "is a regional agency authorized to adopt and enforce regulations governing air pollutants from stationary sources such as factories, refineries, power plants, and gas stations in the San Francisco Bay Area. The District's purpose is to achieve and maintain compliance, in its regional jurisdiction, with state and federal

project is consistent with an adopted Qualified Greenhouse Gas Reduction Strategy that addresses the project's greenhouse gas emissions, it can be presumed that the project will not have significant [greenhouse gas] emission impacts."

In 2010, San Francisco adopted its greenhouse gas strategy. The greenhouse gas strategy is a 321-page document with multiple elements based on the California Natural Resources Agency CEQA Guidelines and the Air District's interpretation of those guidelines. San Francisco's greenhouse gas strategy includes a quantification of baseline levels of greenhouse gas emissions[28] and planned reductions from the baseline 1990 level of 25 percent less emissions by 2020, 40 percent less by 2025 and 80 percent less by 2050. The Air District approved San Francisco's greenhouse gas strategy and found that, in some areas, it "surpassed the minimum standard elements" of a qualified greenhouse gas reduction strategy as laid out in the Air District's CEQA Guidelines. The Air District found the planned reductions to be "more stringent" than state standards and observed that San Francisco is "on track for meeting this aggressive target."

At the heart of San Francisco's greenhouse gas strategy are measures, to be implemented on a project-by-project basis, that are designed to achieve the specified city-wide emission level. These measures focus on four primary areas for reducing greenhouse gas emissions: transportation, energy efficiency, renewable energy, and solid waste. The greenhouse gas strategy includes 42 specific regulations to reduce the emissions from new developments, such as energy efficiency standards and a construction debris recovery ordinance. The strategy includes measures such as tree planting and installation of bicycle racks, the effects of which plaintiffs minimize. But the greenhouse gas strategy also contains stringent energy usage and other regulations to

---

ambient air quality standards." (*Cal. Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 378, fn. 27.)

[28]    San Francisco's 1990 greenhouse gas emissions were approximately 9.1 million tons of carbon dioxide and equivalents ($CO_2E$). In 2004, San Francisco projected 2012 greenhouse gas emissions at 10.8 million tones of $CO_2E$ based on a business-as-usual scenario (without citywide actions to reduce greenhouse gas emissions).

reduce greenhouse gas emissions.[29] San Francisco successfully reduced greenhouse gas emissions by 14.5 percent between 1990 and 2010 despite a population increase of 11 percent during that time period.

The CEQA Guidelines expressly allow agencies to either quantify greenhouse gas emissions from a project or rely on performance based standards (CEQA Guidelines, § 15064.4, subd. (a)), and to "determine that a project's incremental contribution" to climate change is not significant "if the project complies with the requirements in a previously adopted plan" for the reduction of greenhouse gas emissions (CEQA Guidelines, § 15183.5(b)). It is true, as plaintiffs note, that the Guidelines also provide that an agency "should make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project" (CEQA Guidelines, § 15064.4, subd. (a)) and to consider "[t]he extent to which the project may increase or reduce greenhouse gas emissions as compared to the existing environmental setting" (CEQA Guidelines, § 15064.4, subd. (b)(1)). But the Guidelines do not compel a numeric estimate of every project's greenhouse gas emissions.

The Guidelines grant agencies "discretion to determine, in the context of a particular project, whether to: [¶] . . . quantify greenhouse gas emissions resulting from a project . . . and/or [¶] [r]ely on a qualitative analysis or performance based standards." (CEQA Guidelines, § 15064.4, subd. (a).) In its statement of reasons for adopting the greenhouse gas guidelines, the California Natural Resources Agency explained that

---

[29] For example, the strategy requires all commercial buildings greater than 5,000 square feet "to be at a minimum 14% more energy efficient than Title 24 energy efficiency requirements" and "to provide enhanced commissioning in compliance with LEED® Energy and Atmosphere Credit 3," and "to provide on-site renewable energy or purchase renewable energy credits pursuant to LEED® Energy and Atmosphere Credits 2 or 6. Credit 2 requires providing at least 2.5% of the building's energy use from on-site renewable sources. [¶] Credit 6 requires providing at least 35% of the building's electricity from renewable energy contracts." "All new commercial buildings greater than 5,000 sf are required to reduce the amount of potable water used by 20%." The amount of potable water used for landscaping must be reduced by 50 percent.

"CEQA does not require quantification of emissions in every instance." (Cal. Natural Resources Agency, Final Statement of Reasons for Regulatory Action (Dec. 2009) p. 22 <http://resources.ca.gov/ceqa/docs/ Final_Statement_of_Reasons. pdf> [as of Nov. 29, 2016].) "If the lead agency determines that quantification is not possible, would not yield information that would assist in analyzing the project's impacts and determining the significance of the [greenhouse gas] emissions, or is not appropriate in the context of the particular project, section 15064.4(a) would allow the lead agency to consider qualitative factors or performance standards."[30] (*Ibid.*) Given the nature of greenhouse gas emissions—gases that trap heat in the atmosphere, contributing to global climate change but with little immediate perceptible effect on the locale from which they emanate—a project's compliance with an area-wide greenhouse gas reduction plan may be more useful in determining the significance of those emissions on a global scale than quantification of its incremental addition to greenhouse gas emissions.

Plaintiffs fail to show that OCII abused its discretion in approving the FSEIR because it fails to quantify the increased greenhouse gas emissions from the project.[31] The FSEIR concludes that the project complies with energy efficiency and conservation standards set by the greenhouse gas strategy and, thus, is consistent with city-wide (and state-wide) greenhouse gas reduction targets. This choice of methodology is not unreasonable, nor unprecedented. The California Supreme Court expressed approval for a methodology that uses consistency with greenhouse gas reduction plans as a significance criterion for project emissions under CEQA. (*Center for Biological Diversity, supra,* 62 Cal.4th at pp. 220-221, 229-230.) Our high court observed: "Given the reality of growth,

---

[30]     Amici maintain that quantification of the project's greenhouse gas emissions is feasible and request that we take judicial notice of EIRs prepared in connection with other projects that contain such quantifications. We deny the request; feasibility is not in dispute.

[31]     Although not relevant to the sufficiency of the FSEIR analysis, we note that quantitative estimates of the greenhouse gas emissions from the event center (not including the office buildings) have been made and were included in the application for certification of the project as an environmental leadership development project.

some greenhouse gas emissions from new housing and commercial developments are inevitable. The critical CEQA question is the cumulative significance of a project's greenhouse gas emissions, and from a climate change point of view it does not matter where in the state those emissions are produced. Under these circumstances, *evaluating the significance of a* residential or mixed-use *project's greenhouse gas emissions by their effect on the state's efforts to meet it long-term goals makes at least as much sense as measuring them against an absolute numerical threshold*." (*Id.* at pp. 220-221, italics added.)

Plaintiffs concede that an agency may rely on an area-wide greenhouse gas reduction plan to assess the significance of a project's greenhouse gas emissions but contend that *Center for Biological Diversity* requires the agency to first quantify the project's emissions. While the agency in *Center for Biological Diversity* did quantify project emissions, the court did not hold quantification to be necessary in every case. The court identified "potential pathways to compliance" with CEQA, among them a performance-based methodology in which an agency evaluates the significance of a project's greenhouse gas impact by "looking to compliance with regulatory programs designed to reduce greenhouse gas emissions." (*Center for Biological Diversity, supra,* 62 Cal.4th at p. 229.) Such compliance may, standing alone, provide sufficient evidence that the project will have no significant adverse effect on the environment. As the court observed: "To the extent a project incorporates efficiency and conservation measures sufficient to contribute its portion of the overall greenhouse gas reductions necessary, one can reasonably argue that the project's impact 'is not "cumulatively considerable," because it is helping to solve the cumulative problem of greenhouse gas emissions as envisioned by California law.' " (*Id.* at p. 220.)

In summary, substantial evidence supports the FSEIR's conclusion that the project is compliant with energy efficiency and conservation standards set by San Francisco's greenhouse gas strategy to reduce greenhouse gas emissions and that the project therefore will not have a significant adverse effect on the environment in this respect.

**5.** *Toxic air contaminants*

Plaintiffs challenge the FSEIR's conclusion that toxic air contaminant (TAC) emissions during construction and operation of the project will not have a significant adverse effect on air quality and human health. A TAC is "an air pollutant which may cause or contribute to an increase in mortality or in serious illness, or which may pose a present or potential hazard to human health." (Health & Saf. Code, § 39655, subd. (a).) Hundreds of pollutants are identified as TACs, including benzene and formaldehyde. (42 U.S.C. § 7412(b).) TACs are distinct from the six "criteria air pollutants" pervasive in urban environments (ozone, carbon monoxide, particulate matter, nitrogen dioxide, sulfur dioxide, and lead) regulated by specific public-health-based criteria for permissible concentration levels in ambient air. TACs are not subject to ambient air concentration limits but are regulated using a risk-based approach. The Air District Guidelines note that "TACs are primarily regulated through State and local risk management programs" designed to avoid or minimize "adverse health effects from exposure to TACs." The known health risk from those TACs that cause cancer is evaluated by estimating the increased risk of cancer from exposure over a defined period of time, commonly 70 years, and is generally expressed as excess cancer cases per one million exposed individuals . That is, cancer risk is estimated as the incremental probability that an individual will develop cancer over a lifetime as the direct result of exposure to airborne carcinogens.

The FSEIR relates that the project will generate TACS from diesel engine exhaust. According to the FSEIR, "The exhaust from diesel engines includes hundreds of different gaseous and particulate components, many of which are toxic." Diesel exhaust will be emitted during construction by diesel-powered construction equipment and trucks hauling excavated materials and during operations by back-up diesel generators and vehicle traffic.

A health risk assessment was conducted to evaluate potential health risks from TACs generated by diesel fuel use related to the project. The health risk assessment, appended to the FSEIR, evaluated TAC emissions by measuring "total organic gases"

and particulate matter. Particulate matter includes diesel particulate matter, the solid material in diesel exhaust. Diesel particulate matter is a TAC and "is used as a surrogate measure of carcinogen exposure for the mixture of chemicals that make up diesel exhaust as a whole."[32] The health risk assessment calculated emissions from construction equipment and trucks, diesel generators, and vehicle traffic. The health risk assessment then multiplied dose (based on exposure and breathing rate) by toxicity factors to determine the carcinogenic toxicity of TACs that will be emitted during the project's construction and operation.

In accordance with CEQA Guidelines, the health risk assessment focused on the pollution's impact on the most sensitive members of the public. (CEQA Guidelines, Appex. G III. (d).) "Sensitive receptors" in the vicinity of the project were identified as children resident at UCSF Hearst Tower 200 feet from the project and, to a lesser extent, children patients at UCSF Benioff Children's Hospital at a distance of 560 feet. Children are at greater risk from pollution than adults due to several factors, including higher breathing rates, longer lifetime exposure rates and greater sensitivity during development. In determining a child resident's cancer risk from the project, the health risk assessment used the Air District breathing rates[33] and made highly conservative "health protective" assumptions of exposure periods of 24 hours per day at outdoor air concentrations. Based on the health risk assessment, the FSEIR finds that construction of the project (with measures in place to reduce construction emissions) will cause a child resident's lifetime cancer risk to increase by 11 in one million and that operation of the project will cause an

---

[32]    The health risk assessment measured particulate matter in two size ranges, particles less than 10 microns in diameter, and particles less than 2.5 microns in diameter. Diesel particulate matter was assumed to be less than 10 microns.

[33]    Plaintiffs contend the FSEIR improperly applies scientifically-outdated breathing rates, contrary to the good faith full disclosure requirement (CEQA Guidelines, § 15151) upheld in *Berkeley Keep Jets Over the Bay Committee v. Board of Commissioners, supra,* 91 Cal.App.4th at pages 1364-1367. However, although application of the higher rates apparently would increase a child resident's cancer risk caused by the project from 18 to 31 per million, the resulting cumulative cancer risk would remain below the significance threshold utilized in the FSEIR.

excess cancer risk of 7.2 in one million. The existing cancer risk in the area is 26 in one million, making the total risk 44 in one million. The EIR concludes that the project's TACs will not have a significant adverse effect on a child resident's health because the excess cancer risk will be less than the cumulative threshold of significance of 100 in one million.

Plaintiffs dispute the validity of using the 100 in one million total cancer risk as the threshold of significance. As they did during the public comment period, they argue that the assessment of health risks based on a child resident's total cancer risk fails to assess the project-specific impact of TACs. Based on a disputed Air District standard discussed below, plaintiffs contend that any project that individually increases cancer risk by 10 or more in one million, as does this project, must be found to have a significant effect on human health.

Initially, it is not accurate to say, as do plaintiffs, that the FSEIR fails to analyze project-specific impacts. The FSEIR includes a detailed inventory of all TAC emissions related to the project's construction and operation. As just indicated, the FSEIR quantifies the increased cancer risk posed by these emissions. The FSEIR deems the project-specific increased cancer risk greater than 10 per million significant only if the increase produces a cumulative risk greater than 100 per million. Plaintiffs' dispute lies with the threshold of significance used in the FSEIR.

Substantial evidence supports the FSEIR's methodology. As explained in the FSEIR, San Francisco policy is to keep a neighborhood's cumulative cancer risk below 100 per million. The city partnered with the Air District to inventory and assess air pollution and exposures from vehicles and other sources to identify areas in the city with a cancer risk greater than 100 in one million, termed air pollutant exposure zones. In those zones, a project increasing cancer risk by 10 or more per million is deemed to have a significant adverse environmental effect. In areas of the city such as the project site that are not within such a zone, a project is not deemed to have a significant effect unless it both increases cancer risk by 10 or more per million and increases the cumulative risk for the neighborhood to greater than 100 per million. The FSEIR explains in its response to

48

public comments that a project's contribution to existing health risks is insignificant if a resident's lifetime cancer risk from all pollutants in the neighborhood remain below 100 per million.

Plaintiffs incorrectly contend that this threshold of significance is contrary to Air District standards. In 2010, the Air District did adopt recommended CEQA thresholds of significance containing a threshold of increased cancer risk of more than 10 per million (or compliance with a qualified community risk reduction plan). However, the Air District was ordered in 2012 to set aside those thresholds and invalidation of those thresholds was recently partially upheld on appeal. (*Cal. Bldg. Industry Assn. v. Bay Area Air Quality Management Dist.* (2016) 2 Cal.App.5th 1067, 1074-1076, 1087-1088, 1090.) The currently operative 2012 air quality guidelines do not recommend CEQA thresholds of significance for use by local governments. Instead, the Air District refers agencies to "a number of resources" for "reference" and directs them to "examine the substantial evidence in determining appropriate air quality thresholds." Among the referenced resources are its 1999 CEQA Guidelines that includes a TAC threshold of significance of 10 in one million, which is the one advocated by plaintiffs. (BAAQMD CEQA Guidelines Assessing the Air Quality Impacts of Projects and Plans (Dec. 1999) p. 18 <http://www.baaqmd.gov/~/media/files/planning-and-research/ceqa/ceqaguid.pdf> [as of Nov. 29, 2016].) However, the Air District's current guidelines do not "endorse or recommend" that particular threshold and other cited resources use the 100 in a million threshold of significance used in the FSEIR, including the United States Environmental Protection Agency (EPA). (71 Fed. Reg. 47680, Aug. 17, 2006; 54 Fed. Reg. 38044-01 (Overview) Sept.14, 1989.) In assessing the risk from TACs, the EPA has "determined that a maximum individual risk of approximately 100-in-a-million should ordinarily be the upper end of the range of acceptable risks associated with an individual source of emissions." (71 Fed. Reg. 47680.) In doing so, the EPA observed that "[t]he determination of what represents an 'acceptable'" risk is based on a judgment of 'what risks are acceptable in the world in which we live.' " (*Ibid.*)

Indeed, in the May 2010 document issued by the Air District proposing CEQA thresholds of significance, the agency observed that it "is not aware of any agency that has established an acceptable level of cancer risk for TACs. However, a range of what constitutes a significant increment of cancer risk from any compound has been established by the U.S. EPA. EPA's guidance for conducting air toxics analyses and making risk management decisions at the facility- and community-scale level considers a range of acceptable cancer risks from one in a million to one in ten thousand (100 in a million)."

California's CEQA Guidelines likewise recognize that an agency's adoption of a threshold of significance requires an exercise of reasoned judgment. "The determination of whether a project may have a significant effect on the environment calls for a careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data." (CEQA Guidelines, § 15064, subd. (b).) "CEQA grants agencies discretion to develop their own thresholds of significance" and an agency's choice of a significance threshold will be upheld if founded on substantial evidence. (*Save Cuyama Valley v. County of Santa Barbara, supra,* 213 Cal.App.4th at p. 1068.) The FSEIR's use of a significance threshold consistent with EPA standards is founded on substantial evidence. The FSEIR provides all of the information necessary to inform the public of the risks and for the city's decision makers to make an informed choice in weighing the health risks from TACs in deciding whether to approve the project.

## II. Compliance with zoning requirements

Plaintiffs contend the project does not conform to the zoning designation in the Mission Bay South redevelopment plan. Plaintiffs' contentions in this regard have been rather fluid, often ill-defined, and arguably waived by their failure to timely present them in the administrative proceedings or in the superior court.[34] We address and reject on the

---

[34] In the trial court, plaintiffs challenged the city's approval of the project on the ground that the arena does not qualify as a permissible secondary use under the plan. The trial court rejected this argument and plaintiffs have not challenged the trial court's ruling. In their opening appellate brief, plaintiffs note only that "Under the plain meaning

merits their principal contention in this court, that the project exceeds the allowable square footage for retail establishments.

The project is located on blocks 29-32 in Zone A of the Mission Bay South redevelopment plan area. The blocks are zoned "Commercial Industrial/Retail." "Retail sales and services" is one of numerous principal land uses permitted at the project location.[35] The plan defines "retail sales and services" as a "commercial use which provides goods and/or services directly to the customer including outdoor activity areas and open air sales areas. It may provide goods and/or services to the business community, provided that it also serves the general public." Under the redevelopment plan, Zone A may include up to 20,700 leasable square feet of city-serving retail and 159,300 leasable square feet of neighborhood-serving retail.

The FSEIR points out that after deducting previously authorized uses from the square footages designated in the redevelopment plan, 50,464 leasable square feet remain available for retail use in Zone A. As the FSEIR states, this remaining allocation is sufficient to accommodate the project's proposed 29,732 leasable square feet of neighborhood-serving retail and 20,700 leasable square feet of city-serving retail. A memorandum prepared by OCII staff supports this conclusion.[36]

of the words, the arena does not meet criteria for any of those uses and cannot qualify as a secondary use. However, since the arena cannot be approved in the Zone A retail zoning, the secondary use violations are not at issue." In their opening brief plaintiffs also assert that the project "does not align with the plan's allocation of almost 6 million square feet of leasable space intended to accommodate expansion of biotech research facilities" but they provide no citations or further argument in support of that statement and we therefore deem the argument waived.

[35] Other principal uses include, among others, office use, restaurants, arts activities and spaces, parking, and outdoor activity area. Discretionary secondary uses include, among other classifications, nighttime entertainment, recreation building and public structure.

[36] The memorandum states: "The project is proposing to use 1,003,209 leasable square feet for commercial uses and up to 50,464 for retail uses and to use 228,917 square feet of developable area, as is depicted in the combined basic concept/schematic designs that the commission is scheduled to consider on November 3, 2015. Based on these figures and the analysis of other Zone A projects and other [Height Zone-5]

Plaintiffs' argument that the city abused its discretion in approving the project because "the 488,000 square foot arena . . . exceeds the limit" relies on the faulty premise that the entire arena building is devoted to retail use. The event center, however, includes numerous components in addition to retail sales and services, including spectator seating and suites, restaurants/bars and clubs, meeting rooms; spectator support facilities such as food service/kitchens, concessions, merchandising and restrooms; Golden State Warriors management offices, practice facility and locker rooms; command center and operations space for police/security, fire protection services and traffic control; media support facilities; and event center operation and maintenance areas. The OCII reasonably counted only the square footage of the retail components against the allocation for retail use in Zone A.

Contrary to plaintiffs' argument, the city has not conceded that the entire event center constitutes a retail use under the Mission Bay South redevelopment plan. The planning department determined in a different context that the arena meets the definition of "retail use" under the Planning Code.[37] The Planning Code, however, does not govern

projects, the project square footage is within the allowable allocations under the redevelopment plan . . . . Staff has recommended that the [OCII] commission adopt a condition of approval for the project that requires deed restrictions for the applicable retail spaces under 5,000 square feet that have been excluded from the gross square footage calculations to ensure that the limitations on these small retail type of spaces are maintained throughout the life of the project."

[37]    Plaintiffs cite to a brief filed by the planning department in connection with an appeal from the approval of the design of the two office buildings included in the project. In this brief the planning department explained that the 25,000 square feet of office space proposed for the arena is not considered "office space" under the Planning Code because it is reasonably characterized "as accessory to the retail use of the event center building." The planning department noted that "retail use" is defined in the Planning Code as "uses that involve the sale of goods, typically in small quantities, or services directly to the ultimate consumer or end user including, but not limited to, retail sales and service uses, commercial entertainment, arts and recreation uses, and retail automotive uses." The department concluded that the event center came within the definition of "entertainment, arts and recreation, retail" which includes "arts activities, general entertainment, livery stables, movie theater, nighttime entertainment, outdoor entertainment, and sports

permissible uses in the project area. The Mission Bay South redevelopment plan provides explicitly that it "shall supersede the San Francisco Planning Code in its entirety, except as otherwise provided herein." Under the definition included in the redevelopment plan, quoted above, the bulk of the arena space does not constitute retail space. Actual retail uses, as defined, do not exceed the limitations of the governing redevelopment plan.

## III. Place of Entertainment permit

Plaintiffs challenge the city's entertainment commission's issuance of a place of entertainment permit to the operators of the planned event center.

Article 15.1 of the San Francisco Police Code regulates ownership and operation of a "place of entertainment" within the City of San Francisco.[38] This article includes provisions making it unlawful for any person to own or operate a place of entertainment without a permit and sets forth the requirements for obtaining the necessary permit. (§§ 1060.3, 1060.4.) As relevant here, Police Code section 1060.5, subdivision (f), provides that the city "shall grant or conditionally grant a permit for a place of entertainment pursuant to this Article unless it finds that: [¶] . . . [¶] (3) The premises or the proposed operation of the business lacks adequate safeguards to prevent emissions of noise . . . that would substantially interfere with the public health, safety and welfare or the peaceful enjoyment of neighboring property." Because the proposed project meets the

---

stadium." As pointed out in the text above, the Mission Bay South redevelopment plan employs a far more limited definition of "retail sales and service."

[38] A "place of entertainment" is defined under article 15.1, section 1060, subdivision (k) of the San Francisco Police Code as "Every premises to which patrons or members are admitted which serves food, beverages, or food and beverages, including but not limited to alcoholic beverages, for consumption on the premises and wherein Entertainment as defined in Subsection (g) is furnished or occurs upon the premises." "Entertainment" is defined to includes among other things "Any act, play, review, pantomime, scene, song, dance act, song and dance act, or poetry recitation, conducted in or upon any premises to which patrons or members are admitted" and "The playing or use of any instrument capable of producing or used to produce musical or percussion sounds, including but not limited to, reed, brass, percussion, or string-like instruments, or karaoke, or recorded music presented by a live disc jockey on the premises. . . ." (S.F. Police Code, § 1060, subd. (g).)

definition of a "place of entertainment" under the Police Code, project proponents are required to obtain a place of entertainment permit in order to hold events at the arena.

On November 10, 2015, the entertainment commission conditionally granted a place of entertainment permit for the proposed project and on December 11, 2015, the board of appeals upheld the issuance of the conditional permit. The board found that the project complies with San Francisco Police Code section 1060.5, subdivision (f)(3) because "[t]he noise control plan and the good neighbor policy are both imposed as conditions of the [permit] and will ensure that there will not be substantial interference with the peaceful enjoyment of neighboring properties" and "[t]he Police Code enforcement provisions for the suspension and revocation of place of entertainment permits will work to ensure on-going compliance with conditions of approval." On appeal, we determine whether substantial evidence supports the city's factual findings and whether the findings support the city's decision. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514-515.)

Plaintiffs contend that the commission was required to reject the permit application because noise levels generated by post-event crowds will violate San Francisco Police Code section 2909, subdivision (b), which governs commercial and industrial property noise limits.[39] In this regard, the FSEIR acknowledges the obvious: "Noise generated by event patrons and retail customers could result in increased noise along surrounding streets, particularly during the evening and nighttime hours (depending on the event timing) and at the end of scheduled games/events when large numbers of people would be departing the event center and walking on local streets to access their transit connections or access their vehicles at local parking locations." The DSEIR estimates that "over 3,000 people would be using the northbound Muni T-Line platform,

---

[39]     San Francisco Police Code section 2909, subdivision (b) provides in relevant part: "No person shall produce or allow to be produced by any machine, or device, music or entertainment or any combination of same, on commercial or industrial property over which the person has ownership or control, a noise level more than eight dBA above the local ambient at any point outside of the property plane."

54

which is approximately 70 feet from and facing the UCSF Hearst Tower housing building. Observations of current platform occupancy during these hours indicate that fewer than 10 persons are typically present on the platform at any one time. Consequently, the proposed project would result in a substantial increase in people gathering in the median of Third Street across from the UCSF Hearst Tower housing complex during the targeted 45-minute post-event egress period for approximately 45 basketball games per year and up to 60 additional full capacity concerts and other sporting events per year." The DSEIR estimates that following basketball games and other large events, noise levels at the Muni platform adjacent to the UCSF Hearst Tower residence will average 14 decibels above the ambient noise level, which plaintiffs assert is six decibels greater than that permitted under section 2909.[40]

As defendants point out, the San Francisco Police Code does not govern mobile noise emanating from disbursing crowds. The ordinance governs fixed noise levels produced "by any machine, or device, music or entertainment . . . on commercial or industrial property over which the person has ownership or control." (§ 2909, subd. (b).) The FSEIR states, expressly and correctly, that the San Francisco noise ordinance "does not address or establish restrictions on mobile sources." Moreover, even if section 2909 applied to mobile sources such as crowd noise, the Police Code would not compel disapproval of a project with an anticipated temporary increase in ambient noise level in excess of the eight decibel limit. Section 1060.5, subdivision (g)(2) of the Police Code expressly authorizes the city to "require the permittee as a condition of the permit to comply with noise limits that are lower *or higher* than those set forth in Article 29 [of the Police Code]." (Italics added.)

---

[40] The FSEIR notes, in response to public comment, that under the new Muni UCSF/Mission Bay station variant, the existing northbound and southbound platforms at the UCSF/Mission Bay light rail stops will be relocated approximately 300 feet further south of the residential buildings. No new estimates were made of the extent to which the relocation will reduce noise impacts on the surrounding structures, and the conclusion remains in the FSEIR that the noise impact will be significant and unavoidable.

55

Extensive sound testing was performed in conducting the environmental analysis and the FSEIR concludes that the estimated increase in ambient noise levels from the project will be significant. The threshold of significance utilized in the FSEIR, however, is not the standard that governs approval or rejection of a place of entertainment permit. An EIR is " 'an informational document' and . . . '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d at p. 391.) In contrast, the permit decision is discretionary and requires a determination of whether the project "lacks adequate safeguards to prevent emissions of noise . . . that would substantially interfere with the public health, safety and welfare or the peaceful enjoyment of neighboring property." Although overlapping, the focus of each is different.

Substantial evidence supports the city's finding that the project has sufficient safeguards to protect the peaceful enjoyment of neighboring properties from substantial noise emissions. Under the terms of the entertainment commission's good neighbor policy and the project's security plan and noise control plan, the permittee is required to take various steps to minimize disruption of the neighborhood. The arena operators must display notices prominently at all exits urging patrons to leave the establishment in a quiet, peaceful and orderly fashion and to station employees at all exits from 10:00 p.m. until after closing to ensure that those exiting the premises are urged to respect the quiet of the neighborhood. The permittee agreed to meet or exceed the required 1:100 security staffing requirement and to take all reasonable measures to ensure the sidewalks adjacent to the premises are not blocked or unnecessarily affected by patrons due to the operations of the premises and to provide security whenever patrons gather outdoors. Finally, the permittee must provide a cell phone number to all interested neighbors that will be answered by someone with authority to respond to complaints. In conditionally approving the permit, the entertainment commission acknowledged its "monitoring and reporting

56

responsibility" to ensure compliance with the permit conditions, including conducting sound tests to ensure compliance with allowable noise limits. In addition, under San Francisco Police Code section 1060.20.1, subdivision (a) the entertainment commission may suspend an entertainment permit if the permittee has operated the business "[i]n a manner that has harmed the public health, safety or welfare by significantly increasing pedestrian congestion, the incidence of disorderly conduct, or the level of noise in the area in which the premises are located" if the permittee has failed, upon request of the police department or entertainment commission, to take reasonable steps to alleviate the conditions. It is not for the court to second guess the adequacy of these measures. There can be no doubt that noise levels in the neighborhood will rise before and after basketball games and other events in the arena. But the record contains substantial evidence supporting the finding that the conditions imposed will prevent these events from substantially interfering with the peaceful enjoyment of the surrounding properties.

## DISPOSITION

The judgment is affirmed.

_____
Pollak, J.

We concur:


_____
McGuiness, P.J.


_____
Jenkins, J.

A148865



SOURCE: OCII, ESA, 2014

Note: Numbers in figure represents Mission Bay Redevelopment Plan block numbers
"X" represents parcels not owned by master developer at the time Mission Bay Redevelopment Plan was adopted
"P" represents open space parcels
"N" represents blocks within Mission Bay North Redevelopment Area

OCII Case No. ER 2014-919-97; Planning Department Case No. 2014.1441E:
Event Center and Mixed-Use Development at Mission Bay Blocks 29-32

**Figure 1-2**
Land Uses in the Mission Bay Redevelopment Plan



Mission Bay Redevelopment Plan Area Boundary

Project Site Boundary

Note: Please see also Figure 3-2, Existing Roadway Network in Mission Bay, for recent roadway improvements in Mission Bay.

SOURCE: Google Maps, ESA, 2014

OCII Case No. ER 2014-919-97; Planning Department Case No. 2014.1441E:
Event Center and Mixed-Use Development at Mission Bay Blocks 29-32

**Figure 3-1**
Aerial Photograph of Mission Bay

| | |
|---|---|
| Trial court: | City & County of San Francisco Superior Court |
| Trial judge: | Honorable Garrett L. Wong |
| Counsel for plaintiffs and appellants Mission Bay Alliance, SaveMuni, and Jennifer Wade: | BRANDT-HAWLEY LAW GROUP, Susan Lynne Brandt-Hawley |
| | LAW OFFICES OF THOMAS N LIPPE, Thomas Neil Lippe |
| | SOLURI MEERVE, A LAW CORPORATION, Patrick Matthew Soluri and Osha R. Meserve |
| Counsel for amicus curiae of Center for Biological Diversity, Coalition for Clean Air Communities for a Better Environment, and Sunset Coalition on behalf of appellants: | CHATTEN-BROWN & CARSTENS Jan Chatten-Brown, Douglas P. Carstens, Josh Chatten-Brown, and Michelle Black |
| Counsel for defendants and respondents Office of Community Investment and Infrastructure, the City of San Francisco: | CITY AND COUNTY OF SAN FRANCISCO, Dennis J. Herrera, James M. Emery, and Brian F. Crossman, |
| | OFFICE OF THE COMMUNITY INVESTMENT AND INFRASTRUCTURE, James B. Morales |
| | THOMAS LAW GROUP, Tina A. Thomas and Christopher J. Butcher |
| Counsel for real parties in interest and respondents GSW Arena LLC and David Kelly: | GIBSON, DUNN & CRUTCHER LLP, Daniel Miles Kolkey, Mary G. Murphy, Matthew S. Kahn, Kirsten Galler, and Theordore M. Kider |
| | REMY MOOSE MANLEY, LLP Whitman F. Manley, James G. Moose, and Christopher L. Stiles |

A148865